UNITED STATES of America,
Plaintiff–Appellee,

v.

Alejandro PACHECO–MEDINA,
Defendant–Appellant.

No. 99–50414.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 13, 2000

Filed May 16, 2000

Tony L. Cheng, Federal Defenders of San Diego, Inc., San Diego, California, for the defendant-appellant.

Roger W. Haines, Jr., Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

Before: FERNANDEZ and WARDLAW, Circuit Judges, and WEINER,[1] District Judge.

FERNANDEZ, Circuit Judge:

Alejandro Pacheco–Medina appeals his conviction and sentence for being found in the United States after he had been deported. *See* 8 U.S.C. § 1326. He claims that the evidence will not support the conviction because it shows that he did not actually manage to enter the United States. We agree and reverse for entry of an acquittal.

## BACKGROUND

There can be little doubt that Pacheco was deported from the United States on December 7, 1998.[2] There is no doubt

---

1. The Honorable Charles R. Weiner, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

2. Pacheco raises a number of issues besides sufficiency of the evidence. Among them is a claim that his expedited removal was improp-

er and cannot serve to sustain a § 1326 conviction. Others include attacks on the district court's discovery, evidentiary and sentencing rulings. In light of our disposition of the primary claim, we need not and do not decide those.

whatsoever that he was caught on his way back into the United States just two days later.

On December 9, 1998, Pacheco and two others began climbing the international boundary fence that separates the United States from Mexico. On this side of the border was the parking lot of the United States Customs compound. A surveillance video camera detected them as they scaled the fence, and the monitor immediately contacted Border Patrol Agent Dionicio Delgado, who was on bike patrol at the time. Within a matter of seconds Agent Delgado responded to the call. He arrived at the lot just as the three landed. They dropped off the fence and were crouched in preparation for escape into the country at large.

Pacheco's two companions were nabbed immediately, but Pacheco ran by the agent, who instantly gave chase. Pacheco never left the agent's sight except for a split second as he rounded a corner, and within a few yards of the border[3] he was captured and taken into custody. Thereafter, he admitted many of the elements of the crime.

At trial, Pacheco moved for an acquittal. *See* Fed.R.Crim.P. 29. He claimed that because he was never free from official restraint, in legal contemplation he had not even entered the United States. The district court disagreed, he was convicted and sentenced, and this appeal ensued.

## JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291.

■ We review the denial of a motion for acquittal under Federal Rule of Criminal Procedure 29 de novo. *See United States v. Neill,* 166 F.3d 943, 948, (9th Cir.), *cert. denied,* 526 U.S. 1153, 119 S.Ct.

2037, 143 L.Ed.2d 1046 (1999). "Consequently, this court must review the evidence presented against the defendant in the light most favorable to the government to determine whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.* (citation and some internal quotation marks omitted).

## DISCUSSION

■ As we begin to consider whether Pacheco committed a crime, we do so with the knowledge that he was an alien, he had been removed from the country, and he had again, just two days later, set foot on United States soil. It is also clear that it is a crime for an alien to enter, attempt to enter, or "at any time [be] found in" the United States after having once been deported from this country. 8 U.S.C. § 1326(a). Thus, a general reading would suggest that Pacheco did commit the crime because he surely left Mexico for the United States, and he just as surely was found on our soil after he came over the border fence. But as a matter of law it is not quite that easy because physical presence is not enough. That is most clearly shown in the concept of "entry," a concept which has a long judicial history. As the Supreme Court has pointed out, "[t]he definition of 'entry' as applied for various purposes in our immigration laws was evolved judicially." *Rosenberg v. Fleuti,* 374 U.S. 449, 453, 83 S.Ct. 1804, 1807, 10 L.Ed.2d 1000 (1963). The definition did not enter the immigration statutes until 1952. *See id.*

The notion was expressed in a 1908 case where aliens had crossed the border and proceeded for a quarter of a mile along railroad tracks, but had been under the surveillance of border inspectors from before the time they crossed until their actual physical capture. *See Ex parte Chow*

---

3. At one point, Delgado said five yards, but then he said fifteen to twenty yards. At any
rate, Pacheco did not get far.

*Chok,* 161 F. 627, 628–29, (N.D.N.Y.), *aff'd,* 163 F. 1021 (2d Cir.1908). The court said that the aliens had not entered at all. On the contrary:

> They were not "permitted to enter," or allowed to enter, within the meaning and intent of the law. "Enter" means more than the mere act of crossing the border line. Those who seek to enter in the sense of the law, and those the policy of the law seeks to prevent from entering, are those who come to stay permanently, or for a period of time, or to go at large and at will within the United States. These persons, on entering, were at once surrounded by officers, silently taken in charge, in effect arrested, and from that time effectually deprived of their liberty and prevented from going at large within the United States.

*Id.* at 630; *see also Zhang v. Slattery,* 55 F.3d 732, 754–55 (2d Cir.1995); *Correa v. Thornburgh,* 901 F.2d 1166, 1171–72 (2d Cir.1990). The theme has been repeated by the Board of Immigration Appeals. *See Matter of Pierre,* 14 I. & N. Dec. 467 (1973). In that case, the BIA made it clear that, as relevant here, before he can be said to have entered, an alien must be free from restraint. *See id.* at 468. More particularly, "[t]he restraint may take the form of surveillance, unbeknownst to the alien; he has still not made an entry despite having crossed the border with the intention of evading inspection, because he lacks the freedom to go at large and mix with the population." *Id.* at 469. The theme has also been used by other circuits. *See Yi Yang v. Maugans,* 68 F.3d 1540, 1549–1550 (3d Cir.1995); *United States v. Kavazanjian,* 623 F.2d 730, 736–37 (1st Cir.1980).

In a trilogy of cases, we have found that leitmotif running through § 1326, and in so doing have composed the rule that resolves the case now before us. The first of those cases involved a defendant who was convicted of aiding and abetting aliens to enter the United States. *See United States v. Oscar,* 496 F.2d 492, 493 (9th Cir.1974).

In *Oscar,* we reversed because, as we said, the government had to prove that the aliens in question did enter before it could hold Oscar responsible for an entry. *See id.* at 493–94. We recognized that the aliens had crossed the international border and had, therefore, set foot in this country, but that, we said, was not enough because they had never managed to get past secondary inspection. *See id.* at 493. We pointed out that the concrete fact of entry did not suffice because as a legal matter " 'entry' ... has not been accomplished until physical presence is accompanied by freedom from official restraint." *Id.* As it was, the aliens did not enter at all "because they were never free from the official restraint of the customs officials at the San Ysidro Port of Entry." *Id.*

We returned to the area in *United States v. Martin–Plascencia,* 532 F.2d 1316 (9th Cir.1976). There an intrepid alien, who was "out of the view of the immigration officials," managed to get through one fence and then through another one without detection. *Id.* at 1317. He found himself within the United States, but fifty yards later he encountered a concrete wall which separated the port of entry area from the streets of San Ysidro. As he tried to scale that wall, he was finally detected and arrested.[4] *See id.* We upheld the juvenile adjudication based upon his illegal entry because, as we said, he "was at no instant up until the moment of his arrest under any type of official restraint, but to the contrary was exercising his free will, youthful enterprise, and physical agility in evading fixed physical barriers in accomplishing his entry." *Id.* That freedom from official restraint while he was on our soil distinguished Martin's case from Oscar's.

---

4. He was 14 or 15 years old, and it was his 51st arrest for immigration law violations.

*See id.* at 1317.

We took the question up again when a defendant claimed that undercover surveillance was enough to keep an alien under official restraint for the seven months after she illegally crossed the border into the United States. *See United States v. Aguilar,* 883 F.2d 662 (9th Cir.1989). We disagreed. No doubt the illegal smuggling movement of which Aguilar was a part had been penetrated by government agents, who, therefore, knew of the entry of the alien. But those agents were not with the alien, nor were they watching her, at all times. We accepted the doctrine of official restraint, but declared that under it "an alien must be under official restraint at all times during and subsequent to physical entry." *Id.* at 682–83. "The doctrine is premised on the theory that the alien is in the government's constructive custody at the time of physical entry. By contrast, when an alien is able to exercise his free will subsequent to physical entry, he is not under official restraint." *Id.* at 683. Thus, while a government undercover agent did make visits to the alien's home, "brief visits" were insufficient to constitute official restraint because they "were insufficient to prevent her from escaping." *Id.* Similarly, where immigration officials knew that another group of aliens would enter the country, but did nothing to observe or stop the group, its members were not under official restraint. *See id.* at 684. "The aliens were not subject to constant surveillance subsequent to their initial physical entry." *Id.* The defendants' assertions, therefore, failed because the aliens were not in the visual or physical grasp of the authorities at all times. Thus, their situation was quite unlike Oscar's. Had the aliens been under constant observation, the result would have been different. Their situation was also quite unlike Pacheco's. He was under constant and close surveillance and had no hope of escaping into the general population of the

United States. He was observed by government agents as he began his attempt to cross the border, and he never left their sight. In fact, just as he dropped onto our soil an agent was physically on the scene to seize him. His two companions were seized by two other agents, who also arrived immediately. It is true that Pacheco made a desperate attempt to get away, but he was caught within seconds. He was in the clutches of the authorities the whole time and had no opportunity to get free of them.[5] The government says that he tried to get into the country. Be it so. Nonetheless, he did not succeed. He was precluded from doing so because he was under official restraint the whole time.

In short, on the facts of this case, the conclusion that Pacheco did not "enter" the United States is ineluctable. The almost-century-old case of *Chow Chok* so indicates; the BIA's approach so indicates; the other circuits so indicate; and our cases so indicate. But wait a minute, says the government, this case is distinguishable because Pacheco was convicted of being "found in" the United States, and not of entry as such. As we will discuss, that argument is little more than an amphilogism, which exploits the slight ambiguity of the "found in" concept versus the "entry" concept.

No doubt courts have made it clear that § 1326 sets forth three distinct offenses: "enter," "attempt to enter," and "found in." *See United States v. Hernandez,* 189 F.3d 785, 789 (9th Cir.1999); *United States v. Santana–Castellano,* 74 F.3d 593, 597 (5th Cir.1996); *United States v. Rodriguez,* 26 F.3d 4, 8 (1st Cir.1994). But the courts have not been so benighted as to think that a person could be found in the United States if he had never entered at all. In fact, it is difficult to speak of one concept without entangling it in the other.

---

**5.** It is true that during his brief run he had not yet been seized for constitutional purposes. *See California v. Hodari D.,* 499 U.S. 621, 629, 111 S.Ct. 1547, 1552, 113 L.Ed.2d 690 (1991). That does not mean that he was free from official restraint for § 1326 purposes.

In *Chow Chok,* 161 F. at 630, for example, the court expressed the view that "[i]t cannot logically be said that [the aliens] are Chinese persons found unlawfully in the United States.... Logically, they are Chinese persons seeking to enter the United States...." That seems so. Other courts have been more emphatic. We have said that a "found in" conviction "necessarily requires that a defendant commit an act: he must re-enter the United States without permission ... after being deported." *United States v. Ayala,* 35 F.3d 423, 426 (9th Cir.1994); *see also Hernandez,* 189 F.3d at 789. The Eleventh and Eighth Circuits have, essentially, agreed, although they have not said that the entry itself must have been illegal. *See United States v. Castrillon–Gonzalez,* 77 F.3d 403, 406 (11th Cir.1996); *United States v. Diaz–Diaz,* 135 F.3d 572, 576 (8th Cir.1998). On the other hand, the Second Circuit has gone somewhat further. It has held that, "[t]o the extent that § 1326(a) makes it a crime to be 'found in' the United States, that provision is the practical equivalent of making unlawful 'entry' a continuing offense until at least such time as the alien is located." *United States v. Rivera–Ventura,* 72 F.3d 277, 282 (2d Cir.1995).

 We, therefore, reject the argument that because proof of the crime of "entry" is not needed to prove the crime of "found in," cases involving the former do not irradiate the latter. We, instead, hold that the concept of entry not only illuminates but also is embedded in the "found in" offense. No doubt, an entry, as defined legally, is required before a person can be guilty of the crime of entry. By the same token, it logically follows that an entry, as defined legally, is required before a person is "found in" the United States. To put it another way, it is apodictic that Pacheco cannot have been found in a place he did not succeed in entering. He never once got himself into our free air; he was, rather, under official restraint the whole time because he was found before he got in.

In a last attempt to save the day, the government glissades to an irrelevancy. It asserts that IIRIRA[6] has changed the definitions in the Immigration and Nationality Act, and that instead of defining entry the INA now defines the term "admission." 8 U.S.C. § 1101(a)(13)(A). Just why that should matter at all is far from clear. The new definition itself speaks of "entry" as do many other parts of the INA. *See, e.g.,* 8 U.S.C. §§ 1101(a)(13)(C), 1326. It certainly does not change the preexisting, and still existing, judicial development of what an entry is.[7]

## CONCLUSION

Pacheco was removed from this country and attempted to reenter just two days later. His persistence is impressive, although perhaps Pacheco is a mere epigone compared to Martin (51 immigration arrests by age 15). At any rate, his attempt to return resulted in good news and bad news for him. The bad news was that, because he was never free from official restraint, he did not get in. The good news was that, because he was never free from official restraint, he did not commit the crime of being found in the United States. Therefore, a judgment of not guilty must be entered.

**REVERSED and REMANDED.**

---

**6.** Illegal Immigration Reform and Immigrant Responsibility Act, Pub.L. 104–208, § 301(a), 110 Stat. 3009 (1996).

**7.** The old statutory definition declared that an entry was "any coming of an alien into the United States...." 8 U.S.C. § 1101(a)(13)(A) (1996). The elimination of that statement can

have no significance here. Again, the meaning was developed long before the definition was spelled out in the INA. *See Fleuti,* 374 U.S. at 453, 83 S.Ct. at 1807. There is no reason for it to end simply because the definition no longer appears there.