UNITED STATES of America, Plaintiff–Appellee,

v.

Christian RAMOS–GODINEZ, Defendant–Appellant.

No. 01–50043.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 7, 2001

Filed Dec. 4, 2001

Jami L. Ferrara, San Diego, California, for the defendant-appellant.

Patrick K. O'Toole, United States Attorney, Brian M. Pearce, Assistant U.S. Attorney, San Diego, California, for the plaintiff-appellee.

Before: GOODWIN, WALLACE and THOMAS, Circuit Judges.

THOMAS, Circuit Judge:

In this appeal we consider, *inter alia*, whether a brief hiatus in otherwise continuous observation of a deported alien reentering the country is sufficient to establish that the alien was free from official restraint. Under the circumstances presented by this case, we conclude that sufficient evidence exists to support the defendant's conviction for being a deported alien found in the United States in violation of 8 U.S.C. § 1326 and affirm the judgment of the district court.

I

On April 26, 2000, Christian Ramos–Godinez was deported to Mexico. On May 11, 2000, he reentered the United States a few miles west of the Calexico Port of Entry. Border Patrol Agents John Cweika and Marko Kozina were monitoring the so-called "West Checks," an area of open fields where the United States and Mexico are separated by the All–American Canal. The Canal is situated north of the U.S.-Mexico border and flows east-west at the point that Agent Cweika watched through an infrared scope. A dirt "berm" is the actual physical border between the United States and Mexico. The agents were situated approximately 150 yards to a half-mile away from this border, on a field road east of Hammers Road and north of Anza Road. The agents had parked a former ambulance turned into an infrared scope van on the field road and were watching the canal with the scope mounted on top.

The infrared scope has a visual range of approximately three to four miles.

While Cweika was operating the infrared scope, at about 5:30 a.m., he saw seven persons cross the dirt "berm" in the direction of the United States. He then watched the group cross the narrow strip of land immediately north of the border and disappear into the All–American Canal. Cweika was unable to monitor the individuals while they were in the canal because his position was actually at a lower ground level than the canal. He had little doubt, however, that the persons that crossed into the United States and entered the canal were the same ones that he saw climb out of the north side of the canal moments later. He had not seen any images on the infrared scope that would indicate that there were others in the area.

As the individuals climbed out of the All–American Canal, Cweika notified his partner, Kozina, that he "had seven bodies" on his screen. Kozina immediately got into his truck to try to apprehend them. Cweika stayed behind and continued to track the group on the infrared scope as they headed north. He watched the group as they entered an abandoned lot, at which point he was unable to see them, due to the large number of objects in the lot. On panning north, he did not observe anyone leaving the lot.

Meanwhile, Kozina drove to the abandoned lot within minutes of seeing the group leave the canal. He parked and encountered three individuals within moments. The other four were apprehended by Agent Michael Olsen, who arrived approximately five minutes after Kozina. Kozina assumed that the three persons he encountered were part of the group of seven that had just crossed the canal. He did not think that the suspects that he and

Olsen apprehended were from a different, undetected group.

Of the three men that Kozina encountered in the abandoned lot, one was Ramos–Godinez. Kozina first spoke with the two other men and determined that they were illegally in the United States. When he tried to speak to Ramos–Godinez, he did not respond. Ramos–Godinez walked away from Kozina and did not comply with the agent's orders to stop.

Kozina walked toward Ramos–Godinez and grabbed his arm. Ramos–Godinez responded by grabbing the agent's other arm with his free arm. After the agent had focused on him for about thirty seconds, Ramos–Godinez shouted to the other two men and they began to run. These two men got away from the Border Patrol. Meanwhile, Kozina and Ramos–Godinez continued to wrestle for some period of time, with Kozina striking Ramos–Godinez in the leg with a collapsible steel baton and Ramos–Godinez biting Kozina's right arm. With the assistance of other agents, Ramos–Godinez was eventually subdued.

A computerized inquiry at Ramos–Godinez's booking at the Calexico Border Patrol Station showed that Ramos–Godinez had been deported previously. At booking, Ramos–Godinez waived his *Miranda* rights and made a statement. Ramos–Godinez admitted that he was a citizen of Mexico with no lawful permission to enter the United States. He also admitted that he had been deported. Ramos–Godinez said that he had crossed the canal in a raft with others.

Border Patrol Agent Mark Hopkins testified in support of the other elements of the "found in" charge, including Ramos–Godinez's Mexican citizenship, his prior deportation, and his lack of permission to reenter. These facts were admitted by Ramos–Godinez in his post-arrest statement and were not in dispute.

Ramos–Godinez was charged with one count of being a deported alien found in the United States in violation of 8 U.S.C. § 1326. Subsequently, the government filed a superseding indictment adding another count, charging assault of a federal officer in violation of 18 U.S.C. § 111(a). After a trial, a jury returned a guilty verdict on both counts. At sentencing, the district court found that Ramos–Godinez was a category V offender with eleven criminal history points. The court sentenced Ramos–Godinez to a custodial term of twenty-seven months as to each count, with the sentences to run concurrently. The court imposed three years of supervised release as to the § 1326 conviction and two years as to the § 111(a) conviction, with the supervised release periods to run concurrently.

II

■ It is a crime for any alien who has been previously deported to enter, attempt to enter, or at any time be found in the United States without the consent of the Attorney General. 8 U.S.C. § 1326(a). Ramos–Godinez was charged with being found in the United States in violation of § 1326(a). Although Ramos–Godinez was unquestionably within the borders of the United States after deportation, "mere physical presence on United States soil . . . is insufficient to convict him of being found in the United States in violation of 8 U.S.C. § 1326." *United States v. Ruiz–Lopez*, 234 F.3d 445, 448 (9th Cir.2000) (citing *United States v. Pacheco–Medina*, 212 F.3d 1162, 1163 (9th Cir.2000)). To have "entered" the United States under § 1326, an alien must not only have crossed our borders, but must be "exercising his free will" while physically present in this country. *United States v. Martin–Plascencia*, 532 F.2d 1316, 1317 (9th Cir.

1976). Accordingly, if an alien enters the United States free from official restraint, he or she has "entered" the country for the purposes of § 1326. *See Martin–Plascencia,* 532 F.2d at 1317. On the other hand, if the alien is not free from official restraint while in our country, the alien has not "entered" the United States as that term is used in § 1326. *Pacheco–Medina,* 212 F.3d at 1163–64. Thus, in order to sustain a conviction under § 1326, "the government must also establish that the alien entered the United States free from official restraint at the time officials discovered or apprehended him." *Ruiz–Lopez,* 234 F.3d at 448. Following this reasoning, we have held that aliens who had not passed secondary inspection had not "entered" the United States because "they were never free from the official restraint of the customs officials" at the port of entry. *United States v. Oscar,* 496 F.2d 492, 493 (9th Cir.1974).

■ The concept of "official restraint" includes continuous surveillance from the border. "Under settled law, a person cannot be said to have been found in the United States, if he was under constant observation by governmental authorities from the moment he set foot in this country until the moment of his arrest." *United States v. Castellanos–Garcia,* 270 F.3d 773, 775 (9th Cir.2001). Thus, in *Pacheco–Medina,* an alien who was detected scaling a fence at the border by a surveillance camera, spotted as he dropped over on to United States soil and quickly apprehended by United States customs agents was not free from official restraint and therefore had not "entered" the United States. 212 F.3d at 1165. This was true even though he was out of the agent's view "for a split second as he rounded a corner." *Id.* at 1163.

In contrast, when the defendant has managed to evade detection, even for a brief period, we have held that the defendant had "entered" the United States. For example, in *Martin–Plascencia,* the alien was able to pass through two fences without detection, but was caught climbing a wall surrounding the city of San Ysidro. 532 F.2d at 1317. Under those circumstances, we concluded that he had "entered" the United States, albeit briefly, and was exercising his free will up until the point of capture. *Id.* Likewise, we have held that an alien was free from official restraint even though an undercover agent kept the alien under intermittent surveillance for seven months. *United States v. Aguilar,* 883 F.2d 662, 682–83 (9th Cir.1989).

■ Thus, the most significant question in determining whether Ramos–Godinez was free from official restraint is whether he was under constant surveillance from the moment he crossed the border until his apprehension. In considering this question after a conviction, we must determine whether there is sufficient evidence to support the conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

In this case, the undisputed evidence demonstrates that Ramos–Godinez was first observed crossing the border, but was out of law enforcement sight for two significant periods of time: (1) while crossing the All–American Canal and (2) after entering an abandoned lot. The All–American Canal is a concrete-lined channel approximately 360 feet wide, which the seven persons traversed unseen in a raft. The coverage afforded by the abandoned lot was sufficient for the seven to divide unseen into two groups. Thus, although law enforcement was in serious pursuit of Ra-

mos–Godinez and his companions, he was not under "constant observation by governmental authorities from the moment he set foot in this country until the moment of his arrest." *Castellanos–Garcia*, 270 F.3d 773, 775. Rather, like the defendant in *Martin–Plascencia*, Ramos–Godinez was exercising his free will, albeit briefly, while in the United States. In sum, there was sufficient evidence from which a rational trier of fact could have concluded that Ramos–Godinez had "entered" the United States free from official restraint. Therefore, the district court did not err in denying his motion for judgment of acquittal.

### III

Ramos–Godinez also raises several constitutional challenges pursuant to *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). His argument that the fact of a prior conviction under § 1326 must be determined by a jury is foreclosed by *United States v. Arellano–Rivera*, 244 F.3d 1119, 1127 (9th Cir. 2001) ("the district court properly enhanced Arellano–Rivera's offense level on the basis of prior aggravated felonies even though he did not admit to having committed them, and even though the government neither alleged them in the indictment nor proved them at trial beyond a reasonable doubt."). *See also United States v. Parga–Rosas*, 238 F.3d 1209, 1212 (9th Cir. 2001) (reaching the same conclusion where § 1326 defendant went to trial and was sentenced to 57 months as an aggravated felon).

Ramos–Godinez also challenges the constitutionality of 18 U.S.C. § 111(a) as applied to him because the statutory maximum for assault on a federal officer may increase from one year for "simple assault" (a misdemeanor) to three years for "all other cases" (felonies) without being specifically charged in the indictment nor presented to the grand jury or the petit jury. Ramos–Godinez did not present this issue to the district court, so our review is for plain error. *United States v. Castillo–Rivera*, 244 F.3d 1020, 1024 (9th Cir.2001). "To secure reversal under this standard [Ramos–Godinez] must prove that: (1) there was 'error'; (2) the error was 'plain'; and (3) that the error affected 'substantial rights.' ... If these conditions are met, [this Court] may exercise [its] discretion to notice the forfeited error only if the error (4) 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Nordby*, 225 F.3d 1053, 1060 (9th Cir.2000) (citations omitted).

We need not reach the question of whether application of the statute was error because concurrent sentences were imposed on Ramos–Godinez. Thus, he was not sentenced beyond the statutory maximum. *See United States v. Kentz*, 251 F.3d 835, 842 (9th Cir.2001) (rejecting *Apprendi* challenge to sentence-enhancing statute, 18 U.S.C. § 3147, under plain error standard of review where "the same amount of time could have been constitutionally imposed by way of concurrent sentences."). Thus, any error (and we do not reach the question of whether error was committed) was harmless. *See United States v. Rodriguez*, 262 F.3d 1024, 1028 (9th Cir.2001). Because harmless error by definition does not affect substantial rights, it cannot constitute plain error.

**AFFIRMED.**