**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

JOSE GUADALUPE ZAVALA-MENDEZ,
            *Defendant-Appellant.*

No. 03-30321

D.C. No.
CR-03-00037-a-JKS

OPINION

Appeal from the United States District Court
for the District of Alaska
James K. Singleton, Chief Judge, Presiding

Argued and Submitted
July 7, 2004—Anchorage, Alaska

Filed June 15, 2005

Before: Cynthia Holcomb Hall, Andrew J. Kleinfeld, and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Kleinfeld;
Dissent by Judge Hall

## COUNSEL

Kevin F. McCoy, Assistant Federal Defender, Anchorage, Alaska, for the appellant.

Jo Ann Farrington, Assistant U.S. Attorney, Anchorage, Alaska, for the appellee.

## OPINION

KLEINFELD, Circuit Judge:

This is a "found in" case where the previously deported alien presented himself at a border station.

**Facts**

Zavala-Mendez was a passenger in a car that crossed into Alaska on the Alaska Highway from the Yukon Territory on a January night. He had no right to enter the United States, because he had been deported and the Attorney General had not given him permission to reenter.[1] At the border station Zavala-Mendez lied and said he had a green card. But he gave his true name, and it came up on the border station computer showing that he had been deported. He was therefore detained and driven to Anchorage, 430 miles away, where his fingerprints could be scanned and compared to the fingerprints in his alien file. The prints matched.

Zavala-Mendez was convicted of being "found in" the United States after having previously been deported.[2] He was not indicted for attempting to enter the United States.[3] His only defense is legal, that he could not be "found in" the United States when all he did after crossing the border was to go straight to the border station and present himself for entry.

Like all American border stations, the Alaskan facility is inside the United States, so by the time Zavala-Mendez got there, he was already across the survey line that delineates one country from the other. It was dark, and traffic is light on the Alaska Highway in January. There are no lights along the road except at the border, so the immigration inspectors can see the headlights of cars approaching from miles away, and drivers and passengers can likewise see the border from miles away. Zavala-Mendez's car was the first vehicle at the border in four or five hours.

The American border station facility is up a hill, a quarter or half mile from the actual border, because permafrost pre-

---

[1] *See* 8 U.S.C. §§ 1326(a) and (b)(2).

[2] 8 U.S.C. § 1326(a).

[3] *See id.*

vented building the facility closer to the border. The actual border is at the start of the hill. It takes well under a minute to drive at the speed limit from the treaty line between Canada and the United States — marked by a concrete obelisk — to the American border facility where federal personnel are sheltered from the extreme cold. A car is out of sight at the base of the hill — where the surveyed border and obelisk are — for perhaps a half second as it approaches the station, though, of course, the light from the headlights would remain visible in the dark.

A driver can tell when he crosses the border because at the surveyed border there are American and Canadian flags that are lit up all night, a "Welcome To Alaska" sign, and a tourist pullout next to the survey obelisk. The trees are also clear cut, like a power line cut, along the border. Thus, any driver or passenger paying attention would know that he was already across the border when he got to the border station.

As Zavala-Mendez's car approached, an inspector looked, as usual, through binoculars at the license plate, so that the licence plate number could be typed into the computer. Mud obscured the number. That got the inspector out of the station, because water is not a liquid in that part of Alaska in January and the highway does not throw up mud in winter. When the car arrived at the station, one inspector checked the license plate, and the other asked the driver for identifications. The driver, the driver's mother, and Zavala-Mendez all gave their driver's licenses. The computer flagged Zavala-Mendez, so he was taken into custody.

The district court denied Zavala-Mendez's motion for a judgment of acquittal,[4] he was convicted at jury trial, and he appeals. He raises a question as to jury instructions, but we do not reach it because we conclude that he was entitled to have his motion granted.

---

[4]*See* Fed. R. Crim. Proc. 29.

**Analysis**

We review a district court's denial of a Rule 29 motion for a judgment of acquittal *de novo*.[5] The question we must ask is whether the evidence is sufficient. Under *Jackson v. Virginia*,[6] the evidence is sufficient when, viewing the evidence in the light most favorable to the government, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[7]

**[1]** Federal law makes it a crime for "any alien who—(1) has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter (2) enters, attempts to enter, or is *at any time found in*, the United States."[8] We emphasize the "found in" phrase because that is the only branch of the statute used in the indictment. Zavala-Mendez was not charged with attempting to enter, so we need not decide whether he could be convicted of that.

**[2]** There are two relevant lines of authority regarding the "found in" branch of the statute. One involves people who fly to the United States from some other country, get out of the airplane at the airport, and proceed directly to the customs inspection counter where they present themselves. Though our circuit has not spoken to cases such as this, two of our sister circuits have.[9] Our sister circuits agree that in such a case, even if the person is a previously-deported alien without permission to reenter, he cannot be convicted of being "found in" the United States (as opposed to attempting to enter).

---

[5]*United States v. McNeil*, 320 F.3d 1034, 1035 (9th Cir. 2003).

[6]*Jackson v. Virginia*, 443 U.S. 307 (1979).

[7]*Id.* at 319 (emphasis removed).

[8]8 U.S.C. § 1326(a) (emphasis added).

[9]*See United States v. Angeles-Mascote*, 206 F.3d 529, 530-32 (5th Cir. 2000); *United States v. Canals-Jimenez*, 943 F.2d 1284, 1286-89 (11th Cir. 1991).

Of course, in these airport cases, the alien is "in" the United States in a physical sense as soon as the plane crosses into American air space, often hundreds of miles before it reaches the airport where it lands (say, a London to Chicago flight). The alien is also "in" the United States when he walks on American soil during the often lengthy stretch, through corridors and around corners, from the ramp out of the plane to the customs counter. He is often out of sight because the corridors usually go around corners, and, as a practical matter, the crowd of departing passengers obscures the view. There is no way that the immigration inspectors could see a disembarking alien during his walk up the aisle of the plane, and unless they had someone watching the ramp, the immigration inspectors would not see the alien until he made his way through the maze of corridors to the inspection counters.

**[3]** The Eleventh Circuit in *United States v. Canals-Jimenez* emphasizes the word "found" for why a "found in" conviction cannot be sustained in this circumstance. "Found" implies that someone else found the alien in the sense of discovering him, and that is not so where he voluntarily presents himself:

> The phrase "found in" is synonymous with "discovered in." Any party who voluntarily approaches an INS station cannot be said to have been found or discovered in the United States. Any alien who seeks admission through a recognized immigration port of entry might be guilty of entering or attempting to enter the United States, but not of being found in the United States. Congress added the phrase "found in" to alleviate the problem of prosecuting aliens who enter in some illegal manner.[10]

**[4]** The Fifth Circuit goes the same way in *United States v. Angeles-Mascote*. The Fifth Circuit quotes the same para-

---

[10]*Canals-Jimenez*, 943 F.2d at 1287.

graph we do from *Canals-Jimenez*, and agrees that a person is not "found" when he presents himself. In addition, the Fifth Circuit takes account of the well established proposition that a person is not "in" the United States until he is not only physically present on our side of the border, but also enjoys "freedom from official restraint."[11]

Our own circuit has not published any opinions on similar airport "found in" cases. We have published numerous opinions, however, about previously deported aliens who sneak back across the border.[12] In those cases, where the aliens are caught right at the fence, under the full gaze of human eyes and electronic surveillance, we hold that they are not "in" the United States enough to be "found in."[13] If they get out of sight for some substantial period, they are "in."[14] We have drawn fine distinctions between being momentarily out of sight and being out of sight for a while.[15]

Much of the argument in this case focused on whether the moment of time when the slope of the hill blocked the car from the view of the inspectors at the border station was long enough to make this case like an alien who, although out of sight, walked up a box canyon from the border to the waiting arms of the border patrol,[16] or short enough to make it like the alien who was out of sight for only a moment.[17] We conclude

---

[11]*Angeles-Mascote*, 206 F.3d at 531.

[12]*See, e.g., United States v. Vela-Robles*, 397 F.3d 786 (9th Cir. 2005); *United States v. Hernandez-Herrera*, 273 F.3d 1213 (9th Cir. 2001); *United States v. Ramos-Godinez*, 273 F.3d 820 (9th Cir. 2001); *United States v. Pacheco-Medina*, 212 F.3d 1162 (9th Cir. 2000); *United States v. Martin-Plascenscia*, 532 F.2d 1316 (9th Cir. 1976).

[13]*See Pacheco-Medina*, 212 F.3d at 1165.

[14]*See Hernandez-Herrera*, 273 F.3d at 1219.

[15]*See, e.g., Ramos-Godinez*, 273 F.3d at 824 (discussing whether when an alien who disappeared from view while crossing a canal and later an abandoned lot was out of sight enough to be "found in").

[16]*See Vela-Robles*, 397 F.3d at 789.

[17]*See Pacheco-Medina* 212 F.3d at 1163.

that that "surveillance" line of authority is not the appropriate one. Those cases all deal with aliens who did not approach a border station in the designated fashion, but who instead climbed a fence, rafted a canal, or otherwise sneaked across the border in some illegitimate manner. What we were doing, when we granted relief to some of them, was extending the concept that someone who is in the border station itself, which is always on American soil, is nevertheless not "found in" the United States because he is not yet free of official restraint.[18]

[5] This case is not analogous to those cases where the alien sneaked in, avoiding the border station, because Zavala-Mendez proceeded on the designated course from the border directly to the border station.[19] Aliens who proceed directly as instructed by signs or otherwise to the customs facility — be it through an airport corridor, a government designated highway, or some other designated legitimate path — are not sneaking into the United States. Instead they are presenting themselves to American officials in the manner designated by the United States government. An alien who crosses the bor-

_____

[18]*See id.* at 1164-66 (holding that for an alien to "enter" the United States for the purpose of being "found in," the alien has to be free from official restraint).

[19]If this were a case involving fence jumping or some other evasive way of sneaking into the country, the record would arguably still be insufficient to determine beyond a reasonable doubt that Zavala-Mendez made it into the United States free of official restraint. Though the dip at the base of the hill would make it hard to see the car for a moment if it was light, in the dark the headlights would not be out of sight even for an instant. And even if, while the car was out of sight in the dip, Zavala-Mendez had managed to jump out of the car, he would have needed a snowmachine, or dog team, or snowshoes or cross-country skis, and proper arctic gear, to have a chance of successfully traveling up the survey line away from the border station to someplace in the cold vastness where he might find a trail across the border. Many people would rather be arrested and put in a warm jail than leave the safety of "official restraint" and risk such a crossing of the Alaska-Yukon border in January. *See generally*, Jack London, *To Build a Fire*, in 76 *The Century Magazine* 525-34 (1908).

der on a government designated path on a highway should be treated like the airport aliens, not the fence-jumping aliens. Like the defendants in the airport entry cases, Zavala-Mendez must be deemed not to be "found in," because he proceeded directly to the border authorities in the designated manner.

Lying about his green card might have exposed Zavala-Mendez to an "attempting to enter" conviction, but he was not charged with that. He was charged with, and convicted of, being "found in" the United States. To avoid a "found in" conviction, he does not need the fine distinctions our cases have developed in the fence jumping cases.[20] It does not matter that the sight line to his car was blocked for perhaps a half second, and it does not matter that his headlights were visible without interruption for miles in the silent, empty, subarctic night. He was not "found in" because he proceeded just as he was supposed to from the border, on the designated path to the customs inspection station, and presented himself to the authorities at the station. Such a person is much more analogous to an alien who disembarks from an airplane and goes to the inspection counter than to one who jumps a fence, and thus is not "found in" the United States.

---

[20]The dissent concedes that the Fifth Circuit, in *Angeles-Mascote*, distinguishes aliens who present themselves in the designated way at airports from aliens who attempt to jump fences or otherwise sneak into the country, but argues that the Eleventh Circuit has moved away from *Canals-Jimenez* in *United States v. Gay*, 7 F.3d 200 (11th Cir. 1993). We disagree, with respect to cases like the one at bar. The alien in *Gay* got through the border station by returning before the INS put his name into its database of deported aliens. *Id.* at 201. He then stayed in the United States for three years. *Id.* He did not get caught until he sought a security clearance from the Customs Service to get into restricted areas of the airport and was found to be an illegal alien during the security investigation. *Id.* Thus he was found in the United States three years after getting past the official surveillance. Zavala-Mendez never evaded detection and had no period of time in the United States beyond the border station. Our analysis depends not on Zavala-Mendez's state of mind, i.e., what he thought, but rather on what he did, presenting himself immediately at the designated place for people entering the United States, as opposed to being "found in" the United States after evading the border station.

**[6]** An alien who crosses the border at a designated location and proceeds directly in the manner designated by the government to the border station where he then presents himself to the authorities has not been "found in" the United States for the purposes of 8 U.S.C. § 1326(a). Zavala-Mendez is entitled on remand to have his motion for a judgment of acquittal granted and his conviction vacated.

**REVERSED**.

---

HALL, Circuit Judge, dissenting:

By implicitly incorporating an intent element into what is essentially a strict liability crime, the majority's decision threatens to undermine a well-established line of Ninth Circuit cases holding that an alien enters the United States for the purposes of a "found in" conviction once he sets foot on U.S. soil, unless he has been under *constant* surveillance from the moment he crosses the border. Since Zavala-Mendez remained "free[ ] to go at large and mix with the population," *United States v. Hernandez-Herrera*, 273 F.3d 1213, 1219 (9th Cir. 2001) (citation omitted), for a discernible, albeit circumscribed period of time, I would affirm the district court's denial of Zavala-Mendez's Rule 29 motion for acquittal. I respectfully dissent.

*****

Section 1326 sets forth three separate offenses a deported alien may commit en route to the United States. A previously deported alien violates § 1326 if he "enters, attempts to enter, or is at any time found in, the United States." 8 U.S.C. § 1326(a)(2). We have described being "found in" the United States as a "passive state, not requiring proof of a voluntary act." *United States v. Parga-Rosas*, 238 F.3d 1209, 1214 (9th

Cir. 2001) (quoting *United States v. Salazar-Robles*, 207 F.3d 648, 650 (9th Cir. 2000)).

However, we have also developed a legal fiction, termed the "official restraint doctrine," which excepts from prosecution individuals who are technically present on United States soil, but nonetheless "lack the freedom to go at large and mix with the population." *Hernandez-Herrera*, 273 F.3d at 1219 (citation omitted); *Parga-Rosas*, 238 F.3d at 1213; *United States v. Gonzalez-Torres*, 309 F.3d 594, 599 (9th Cir. 2002). The fiction originated in a century-old case in which Chinese immigrants were tailed by officials from Canada into the United States, and thereupon seized for violation of a statute prohibiting them from being "found unlawfully" in the United States. *See Ex parte Chow Chok*, 161 F. 627, 628-29 (N.D.N.Y. 1908), *aff'd* 163 F. 1021 (2d Cir. 1908). The official restraint doctrine thus provides that "mere physical presence on United States soil . . . is insufficient to convict [an alien] of being found in the United States in violation of 8 U.S.C. § 1326. Rather, the government must also establish that the alien entered the United States free from official restraint at the time the officials discovered or apprehended him." *United States v. Ruiz-Lopez*, 234 F.3d 445, 448 (9th Cir. 2001) (citation omitted). An alien is deemed to be officially restrained if, "after crossing the border without authorization, he is 'deprived of [his] liberty and prevented from going at large within the United States.' " *Hernandez-Herrera*, 273 F.3d at 1218 (citation omitted).

The "official restraint" doctrine is construed broadly by this court. *Ruiz-Lopez*, 234 F.3d at 448. Thus, "[a]n alien does not have to be in the physical custody of the authorities to be officially restrained." *Hernandez-Herrera*, 273 F.3d at 1219. "The restraint may take the form of surveillance, unbeknownst to the alien." *Pacheco-Medina*, 212 F.3d at 1164 (quoting *Matter of Pierre*, 14 I. & N. Dec. 467, 469 (BIA 1973)). Authorities may be "restraining" an alien for a lengthy period of time or a substantial distance. "If a government offi-

cial has an alien under surveillance from the moment he passes the port of entry until the moment of arrest, the alien has not 'entered' the United States . . . because the alien was under official restraint the whole time." *Ruiz-Lopez*, 234 F.3d at 448.

The majority's conclusion derives primarily from two decisions of sister circuits, *United States v. Canals-Jimenez*, 943 F.2d 1284 (11th Cir. 1991), and *United States v. Angeles-Mascote*, 206 F.3d 529 (5th Cir. 2000). In each case, a defendant deboarded an international flight at a United States airport. Both defendants voluntarily proceeded to an immigration officer and attempted to gain entry to the United States, whereupon they were apprehended and ultimately convicted for being "found in" the United States. *Canals-Jimenez*, 943 F.2d at 1285-86; *Angeles-Mascote*, 206 F.3d at 530. The Eleventh Circuit held that the "found in" language of § 1326 was inapplicable. *Canals-Jimenez*, 943 F.2d at 1288. "Section 1326 applies only to situations in which an alien is discovered in the United States after entering the country surreptitiously by bypassing recognized immigration ports of entry . . . ." *Id. See also Angeles-Mascote*, 206 F.3d at 531 ("Any party who voluntarily approaches an INS station cannot be said to have been found or discovered in the United States."). However, this language in *Canals-Jimenez* was later determined to be mere dicta. *See United States v. Gay*, 7 F.3d 200, 202 (11th Cir. 1993) ("[T]he *Canals* court was merely using a surreptitious entry as the most obvious example of an illegal entry which would not be detected by immigration officials, and after which an alien who had illegally entered might be 'found in' the United States . . . . Thus, we conclude that the reference in *Canals* to surreptitious entry is mere dicta and is not controlling.").

Even assuming that the Fifth Circuit's pronouncement in *Angeles-Mascote* does not suffer from the same questions regarding its continuing vitality as does the Eleventh Circuit's decision in *Canals-Jimenez*, its analysis is implicitly under-

mined by our caselaw. Like our sister circuits, we have "construe[d] [official] restraint broadly." *Ruiz-Lopez*, 234 F.3d at 448. We have not, however, dispensed with the concept of "restraint" altogether. Instead, we have adhered closely to the stated requirement that, in order to constitute official restraint, an alien must be subjected to *constant* surveillance. *See United States v. Ramos-Godinez*, 273 F.3d 820, 824-25 (9th Cir. 2001) ("[W]hen the defendant has managed to evade detection, even for a brief period, we have held that the defendant had 'entered' the United States."). Thus, in *Hernandez-Herrera*, a defendant-alien was deemed to have been free from official restraint although he was being persistently tracked into an area of dense brush from which there was no hope of escape. 273 F.3d at 1216. We held that Hernandez had not been "continuously surveilled" because "he was no longer visible" to the government official "once he entered the thick brush." *Id.* at 1219. Likewise, Zavala was not visible to the Alcan agents as he drove the quarter-mile from the physical border to the Inspection Station. During that time, even if there had been "no hope of escape" from the densely forested area encompassing the route between the border and Alcan,[1] Zavala was "exercising his free will within the United States" in such a way that he did not enter the country under any official restraint. *Id.*

Nor does the relatively short distance between the U.S.-Canadian border and the Alcan Port of Entry, and correspondingly short duration required to traverse it, militate in favor of the majority's conclusion. In *Hernandez-Herrera*, there was no suggestion that the defendant was able to elude capture while in the thick brush for any significant period of time. *Id.* at 1216. Similarly, in *United States v. Castellano-Garcia*, 270 F.3d 773 (9th Cir. 2001), we determined that an alien had not been under constant surveillance because he introduced no

---

[1]There was no testimony which would liken the forested area outside Alcan to the "dense brush" from which there was "no hope of escape" in *Hernandez-Herrera*. 273 F.3d at 1216.

evidence which suggested that "he was under constant observation by governmental authorities from the moment he set foot in this country until the moment of his arrest." *Id.* at 775. Instead, Castellanos had been discovered serendipitously by an immigration officer, without the aid of any sensor or other detection device, approximately 100 yards from the U.S.-Mexico border. *Id.* at 774-75. We held that, in light of the dearth of evidence to suggest that Castellanos had been identified at the precise moment he crossed the border, the "free floating speculation that he might have been observed the whole time" was insufficient to undercut the government's position. *Id.* at 776.[2] As such, Castellanos was "free to migrate into the general population for some time, and was not under constant observation during that period." *Id.* at 775.

In *Ramos-Godinez*, we were confronted with a defendant who was observed crossing the border, but temporarily evaded surveillance when he crossed a 360-feet wide concrete canal which was obscured from the border patrol agent's field of vision, and when he entered an abandoned lot. 273 F.3d at 824. "[A]lthough law enforcement was in serious pursuit of Ramos-Godinez and his companions, he was not under 'constant observation by governmental authorities . . . .'" *Id.* at 824-25 (quoting *Castellanos-Garcia*, 270 F.3d at 775). During those brief periods of detachment, "Ramos-Godinez was exercising his free will." *Id.* at 825. The facts elicited by Zavala present no more of a case than did those in *Castellanos-Garcia* and *Ramos-Godinez*. Zavala entered the United States unbeknownst to the Alcan agents, and remained undetected for approximately one-quarter of a mile into U.S. territory.

---

[2]*Compare Ruiz-Lopez*, 234 F.3d at 448-49 (holding that evidence adduced by government was insufficient to carry burden because the arresting official, whose standard practice was to closely monitor all individuals attempting to cross the border at the Tecate processing center, could not recall the precise circumstances of the arrest; since Ruiz may have been under constant surveillance from the moment he crossed the border, no rational juror could conclude that Ruiz was free from official restraint).

The fact that he proceeded directly to the inspection station did not render him officially restrained.

The situations in which we have found constant surveillance which may be construed as official restraint do not aid Zavala. In *Pacheco-Medina*, the defendant and two others were detected by a surveillance camera as they attempted to scale the fence guarding the U.S.-Mexico border. Pacheco's two associates were apprehended immediately upon reaching the ground, while Pacheco was chased from the moment he landed. Pacheco left the agent's sight for only a "split second as he rounded a corner," and was captured within a few yards of the border. *Pacheco-Medina*, 212 F.3d at 1163. We found that Pacheco had been under "constant surveillance" because "[h]e was in the clutches of the authorities . . . and had no opportunity to get free of them." *Id*. at 1165. In contrast, Zavala was not identified until he had traversed the quarter-mile between the border and the inspection station. The fact that he drove directly to Alcan does not alter the fact that during that quarter-mile, he was free to exercise his will by absconding into the dense forest surrounding the road, and was therefore free from official restraint.

Zavala entered the United States unnoticed by the officials at Alcan. Testimony at trial indicated, in fact, that the physical border was completely shielded from the view of the Alcan Port of Entry. From the time that Zavala crossed the border into the United States until the moment he was first observed by the Alcan agents, Zavala was free "to go at large and mix with the population." *Hernandez-Herrera*, 273 F.3d at 1219. That he drove directly to the inspection station and presented himself for review may have been relevant to his state of mind in a prosecution for attempted illegal entry; it is utterly irrelevant to the question of whether he had "entered" the United States for the purposes of being "found in" the country illegally. Since he was not under constant surveillance from the moment he entered the U.S. until the moment of his arrest, viewing the evidence in the light most favorable to the gov-

ernment, a rational trier of fact could easily conclude that Zavala was not under the "official restraint" of governmental authorities. I would, therefore, affirm the district court's denial of Zavala's Rule 29 motion for acquittal.