**Surinder SIDHU, Petitioner,**

**v.**

**John ASHCROFT,\* Respondent.**

**No. 02–73220.**

United States Court of Appeals, Ninth Circuit.

Submitted March 31, 2004.\*\*

Filed May 27, 2004.

---

\* The petition for review correctly identified the Immigration and Naturalization Service (INS) as the respondent in this transition rule case. Illegal Immigration Reform and Immigrant Responsibility Act § 309(c), Pub.L. No. 104–208, 110 Stat. 3009 (Sept. 30, 1996), as amended. On March 1, 2003, the INS ceased to exist as an independent agency within the Department of Justice (DOJ) and its functions were transferred to the newly formed Department of Homeland Security. Because this appeal challenges a decision issued by the Executive Office of Immigration Review (encompassing both the Board of Immigration Appeals (BIA) and the immigration courts), which is a component of the DOJ, Attorney General Ashcroft, as the head of the DOJ, is substituted for the INS. *See* 8 U.S.C. § 1252(b)(3) (2000) (respondent is Attorney General where immigration court proceeding commenced after April 1, 1997).

\*\* This panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R.App. P. 34(a)(2).

Garish Sarin, Los Angeles, CA, for the Petitioner.

Luis E. Perez, Washington, DC, for the Respondent.

Before PREGERSON, BEEZER, and TALLMAN, Circuit Judges.

TALLMAN, Circuit Judge.

Surinder Sidhu petitions for review of a final order of exclusion issued by the Board of Immigration Appeals (BIA). The BIA affirmed without opinion the Immigration Judge's (IJ) Order, which found Sidhu excludable from the United States pursuant to § 212(a)(6)(E)(i) of the Immigration and Nationality Act (INA) for knowingly assisting an undocumented alien to enter the country in violation of the immigration laws. Sidhu seeks review of this decision, contending that she should have been placed in deportation rather than exclusion proceedings because she had "entered" the United States.[1]

The question for decision is whether Sidhu effected an "entry" within the meaning of 8 U.S.C. § 1101(a)(13) when she was detained by authorities before exiting the secondary inspection area at a port of entry. We hold that Sidhu did not make an "entry" into the country when she was detained by customs officials before exiting a controlled access area at an airport. Accordingly, Sidhu was not entitled to deportation proceedings, and we deny the petition for review.

I

Sidhu, a native and citizen of India, was admitted to the United States as a lawful permanent resident on May 30, 1993. On June 12, 1995, she sought to re-enter the United States at Los Angeles International Airport (LAX), on a China Airlines flight from Taiwan. When she arrived, a primary immigration inspector performed a verbal inspection and stamped her passport as admitted.

After Sidhu proceeded through primary inspection, Officer Roldan, a Supervisory Immigration Inspector at LAX working in secondary inspection, requested Sidhu's assistance. Officer Roldan was trying to communicate with a young Indian male who was found wandering around the primary inspection area without any documentation or identification.[2] Sidhu ascer-

---

1. We have addressed Sidhu's remaining claims, that the IJ improperly admitted evidence in violation of her right to due process, and that the IJ's decision that she engaged in alien smuggling was not supported by substantial evidence, in a concurrently-filed memorandum disposition.

2. Because Sidhu and the young man appeared to be of the same nationality, Officer Roldan hoped that Sidhu would be able to communicate with him.

tained that the young man's name was Yatwinder Singh and that he placed his documents in the trash in the men's restroom. She communicated this information to Officer Roldan.[3]

While Officer Roldan was working with Sidhu, he was notified that primary inspection had referred Sidhu to secondary inspection for further investigation. She was referred after the primary inspector stamped her passport because his query to the Treasury Enforcement Communications System (TECS), which tends to retrieve reports slowly, had subsequently indicated that the inspector should check the National Alien Information Look Out computer system (NAIL). Officer Roldan checked NAIL and learned that Sidhu was a suspected alien smuggler. The NAIL report, provided by Hawaiian immigration inspectors, recounted that on July 11, 1994, Sidhu entered the United States at the Honolulu, Hawaii, airport. After the passengers deplaned, an Indian man arrived at inspection without any documents. The Hawaii inspectors learned that the Indian man used Sidhu's son's alien registration card to board the flight.

Upon learning this information in Los Angeles, Officer Roldan became suspicious that Sidhu was involved with Singh's attempt to enter the United States illegally due to the similar modus operandi she had used in the Hawaiian incident. After asking Sidhu some preliminary questions, he decided to use an interpreter.[4] Subhadra Murphy interpreted for Officer Roldan in the Hindi language. Sidhu gave a sworn statement based on the questions asked by Officer Roldan and interpreted by Murphy.[5]

Initially, Officer Roldan questioned Sidhu regarding her family, residency, and her most recent entries into the United States. When he asked about Yatwinder Singh, the 11–year–old boy found on the plane, she first stated that she had never seen him before Officer Roldan requested her assistance. Officer Roldan then obtained an airline passenger manifest from China Airlines for Sidhu's flight. It revealed that Sidhu checked in at the Taipei airport with an 11–year–old boy named Rojit Mahajan and that they sat next to each other on the plane. When confronted with this information, Sidhu revealed that the young man's true name was Yatwinder Singh and she admitted that he was her nephew. Sidhu told Officer Roldan that Singh's father sent Singh's mother the false passport and paid for Sidhu's expenses to bring him to the United States. Sidhu stated that her brother had been killed in the Punjab by Indian terrorists and her family wanted Singh to go to the United States for safety. She admitted that she checked in with him, sat next to him on the plane, knew he was traveling with fraudulent documents, and knew that he had been instructed to destroy the documents when he arrived at LAX. Officer Roldan then showed her the U.S. Passport that Officer Ramero found in the trash where Singh told him it would be. She identified it as the one that Singh used to board the plane.

Officer Roldan questioned Sidhu regarding her last entry into the United States

---

**3.** Officer Ramero was assigned to search the restroom trash. He located U.S. Passport No. 033992553, containing the name Rojit Mahajan, and turned it over to his supervisor.

**4.** Until this point, Sidhu and Officer Roldan had communicated in English.

**5.** At the exclusion hearing, Officer Roldan testified that Murphy and Sidhu appeared to communicate well. There were no unusually long pauses and it did not appear as though Murphy had to repeat any questions. The statement was read back to Sidhu and she indicated that she did not need to make any corrections.

through Honolulu. Sidhu admitted that in exchange for $500, she had allowed an Indian man to use her son's green card at the Bangkok Airport to board the flight to Honolulu. She sat next to him on the plane and then he appeared at inspection without appropriate documents.

After Sidhu finished giving the statement, Officer Roldan took Sidhu into custody. The government initiated exclusion proceedings and contended that Sidhu was inadmissible because she had engaged in alien smuggling. At Sidhu's exclusion hearing on October 28, 1997, Officers Roldan and Ramero testified as to the events discussed above. The IJ issued an oral decision, finding that Sidhu was excludable because the government established by clear and convincing evidence that she had engaged in alien smuggling in violation of INA § 212(a)(6)(E)(i), 8 U.S.C. § 1182(a)(6)(E)(i). Sidhu appealed this ruling to the BIA, which summarily affirmed.

## II

■ We have jurisdiction pursuant to 8 U.S.C. § 1105a(a).[6] Where, as here, the BIA affirms the decision of the IJ without opinion, we review the decision of the IJ as the final agency decision. *See Falcon Carriche v. Ashcroft*, 350 F.3d 845, 849 (9th Cir.2003).

## III

■ Under the version of the INA in effect at the time of Sidhu's exclusion proceedings, "excludable" aliens, those seeking admission from outside the United States, were entitled to fewer procedural protections than "deportable" aliens, those already physically present in the United States. *See Xi v. INS*, 298 F.3d 832, 838 (9th Cir.2002); *see also Landon v. Plasencia*, 459 U.S. 21, 25–27, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982).[7] Once an alien effected an "entry" into the United States, regardless of whether the entry was lawful or not, the relatively greater protections of deportation proceedings were required. *See Shaughnessy v. United States*, 345 U.S. 206, 212, 73 S.Ct. 625, 97 L.Ed. 956 (1953); *see also Landon*, 459 U.S. at 30–32, 103 S.Ct. 321 (holding that the question of whether an alien has made an entry may be decided at either a deportation or exclusion hearing).

■ The determination of whether Sidhu was properly placed in exclusion proceedings or should have been placed in deportation proceedings depends upon whether she effected an entry. At the time that Sidhu attempted to return to the United States, "entry" was defined as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession." INA § 101(a)(13), 8 U.S.C. § 1101(a)(13). The BIA has adopted a more detailed definition, which requires: "(1) a crossing into the territorial limits of the United States, *i.e.*, physical presence; (2)(a) inspection and admission by an immigration officer, or (b) actual and intentional evasion of inspection at the

---

**6.** The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) repealed 8 U.S.C. § 1105a and replaced it with new rules for judicial review now codified at 8 U.S.C. § 1252. *See* IIRIRA § 306(c)(1), Pub.L. No. 104 208, 110 Stat. 3009 (Sept. 30, 1996), *as amended by* the Extension of Stay in the United States for Nurses Act, Pub.L. No. 104–302, 110 Stat. 3656 (Oct. 11, 1996). However, this case is governed by IIRIRA's transitional rules and we continue to have

jurisdiction pursuant to 8 U.S.C. § 1105a because the INS commenced exclusion proceedings against Sidhu prior to April 1, 1997, and the final order of exclusion was entered after October 30, 1996. *See* IIRIRA § 309(c)(1).

**7.** IIRIRA merged deportation and exclusion proceedings into the broader category of "removal" proceedings. *See Kalaw v. INS*, 133 F.3d 1147, 1149 n. 2 (9th Cir.1997).

nearest inspection point; and (3) freedom from official restraint." *See Matter of Patel*, 20 I. & N. Dec. 368, 370 (1991).

*This circuit has never formally adopted the BIA's test*, although we have cited to it with approval, *see Espinoza–Gutierrez v. Smith*, 94 F.3d 1270, 1273 n. 2 (9th Cir. 1996), and several of our sister circuits have adopted it, *see Nyirenda v. INS*, 279 F.3d 620, 624 (8th Cir.2002); *Yang v. Maugans*, 68 F.3d 1540, 1545 (3d Cir. 1995); *Correa v. Thornburgh*, 901 F.2d 1166, 1171 (2d Cir.1990); *Farquharson v. United States Att'y Gen.*, 246 F.3d 1317, 1320–21 (11th Cir.2001). Because the BIA's more detailed formulation has served our sister circuits well, we now join them and formally adopt the BIA's standard.

IV

■ Sidhu challenges her placement in exclusion proceedings, asserting that she effected an "entry" into the United States and therefore she was entitled to a deportation proceeding. After her passport was stamped "admitted," she contends she was not under surveillance or under any official restraint, but was only helping Officer Roldan communicate with Singh. In contrast, the government counters that Sidhu was properly placed in exclusion proceedings because she did not "enter" the United States. Since she never left the Federal Special Services area at LAX, the government concludes that she was never free from official restraint.

Sidhu undoubtedly established physical presence, the first prong of the test for assessing whether an entry was made. She was detained after the flight landed and she entered the airport complex. It is arguable whether or not she was inspected and admitted by an immigration officer. Although she passed primary inspection and her passport was stamped admitted, she was still required to pass through sec-ondary inspection. Regardless of whether Sidhu established inspection and admission, she fails to establish the third element; she was not free from official restraint.

A primary inspector questioned Sidhu and stamped her passport "admitted." When he received the TECS report information at a later time—but before Sidhu exited the controlled area—he notified his supervisor. Using this information, Officer Roldan, in secondary inspection, determined that Sidhu was illegally attempting to bring an alien into the United States.

At LAX, the secondary inspection area is located approximately 30 feet behind the primary inspection line, next to the luggage claim area. It is at the southern end of the inspection area, but still within the Federal Special Services area. Officer Roldan prevented Sidhu from leaving the inspection area and he placed her into custody. Because Sidhu never exited secondary inspection, she was not free from official restraint. *See Correa*, 901 F.2d at 1169–72 (holding that an alien who passed primary inspection, but was stopped by USDA agents for a more intensive agricultural inspection was never free from official restraint because she remained in a restricted "Customs Enclosure" area and was "never free to physically enter the United States or to go at large and mix with the general population"); *see also United States v. Oscar*, 496 F.2d 492, 493 (9th Cir.1974) (finding, in a criminal context, that aliens were not free from official restraint of the customs officials because they were taken into custody in secondary inspection at the San Ysidro Port of Entry).

Sidhu contends that our decision in *United States v. Martin–Plascencia*, 532 F.2d 1316 (9th Cir.1976), mandates a different result. In *Martin–Plascencia*, we found that an alien who crawled through

two fences, and ran fifty yards undetected before he was apprehended attempting to scale a city wall at San Ysidro, was not under any type of official restraint. *Id.* at 1317–18. The facts of this case are distinctly different from those in *Martin–Plascencia.* While crossing the border, Martin–Plascencia was never under any customs surveillance or restraint. In contrast, Sidhu was under such surveillance from the moment she entered the airport until she was detained. At no point was she free to exit the airport and "go at large and mix with the general population." *See Correa,* 901 F.2d at 1172.

Because Sidhu was taken into custody in secondary inspection at LAX, she was never free from official restraint. Accordingly, she did not effect an entry and was not entitled to a deportation hearing.

**PETITION DENIED.**