**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

RAFAEL CRUZ-ESCOTO,
        *Defendant-Appellant.*

No. 05-50892

D.C. No.
CR-04-02255-MLH

OPINION

Appeal from the United States District Court
for the Southern District of California
Marilyn L. Huff, District Judge, Presiding

Argued and Submitted
October 24, 2006—Pasadena, California

Filed February 23, 2007

Before: Eugene E. Siler, Jr.,* A. Wallace Tashima, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Siler;
Dissent by Judge Tashima

---

*The Honorable Eugene E. Siler, Jr., Senior United States Circuit Judge
for the Sixth Circuit, sitting by designation.

**COUNSEL**

Martha M. Hall, San Diego, California, for the defendant-appellant.

Carol C. Lam, United States Attorney, Roger W. Haines, Assistant United States Attorney, Mark R. Rehe, Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

**OPINION**

SILER, Circuit Judge:

Rafael Cruz-Escoto appeals his jury conviction and sentence for being a deported alien found in the United States

without permission, in violation of 8 U.S.C. § 1326. He presents six arguments on appeal: (1) the evidence was insufficient to support the verdict; (2) the district court improperly instructed the jury; (3) the district court violated his Fifth and Sixth Amendment rights by excluding the testimony of an impeachment witness; (4) the introduction of evidence that he twice illegally entered the United States violated Federal Rules of Evidence 401, 403, and 404(b); (5) the government violated *Batson v. Kentucky*, 476 U.S. 79 (1986); and (6) the district court impermissibly increased his sentence above the statutory maximum. We AFFIRM.

## I.  BACKGROUND

In 2004, Border Patrol Agent Jason Viau conducted surveillance of an area along the Mexico-United States border known as the "Channel." The Channel, located in California just north of Tijuana, is a cement river bed that runs north from Mexico into the United States, where it eventually empties into the Pacific Ocean. There are no fences where the Channel enters into the United States;[1] however, a painted yellow line on the bottom of the Channel marks the international border. The Border Patrol has a permanent post located at this vulnerable section of the Channel. This permanent post is not a designated port of entry, and consists of a uniformed agent in a marked car who conducts a twenty-four hour surveillance of the area, which is illuminated by large lights.[2]

---

[1]While there are no fences at the point where the Channel enters into the United States, there are two fences located along other areas of the southern bank. The fences run parallel to each other, separated by only twenty to thirty yards. The first fence is made of steel and is approximately eight feet tall. The second fence is a cement fence, known as the "Ballard fence," nearly fifteen feet tall.

[2]The agent station at the permanent post guards not only the fence gap in the Channel, but also other fenced areas in the Channel. These areas are an attractive point of entry for undocumented aliens because even though they are fenced, they are not as well-lit as the gap in the Channel.

During his midnight shift, Agent Viau saw Cruz-Escoto running northbound in the Channel in front of the Ballard Fence, approximately 100-150 yards inside the United States. Agent Viau drove his Jeep into the Channel and, after a brief scuffle, arrested Cruz-Escoto. Cruz-Escoto admitted to Agent Viau that he was a citizen of Mexico and did not have proper documentation to permit him to enter the United States. He was subsequently indicted for being a deported alien found in the United States, in violation of 8 U.S.C. § 1326.

At trial, Agent Viau testified that he did not see Cruz-Escoto cross the border and could not say how or where Cruz-Escoto entered the United States. The government also introduced evidence that Cruz-Escoto had twice been removed from the United States and that he had never applied for permission to re-enter. Cruz-Escoto was convicted of violating § 1326.

At Cruz-Escoto's sentencing hearing, the district court increased his sentence above the two-year statutory maximum to eighty-four months because it found that he had previously been deported following a felony conviction.

## II.   STANDARD OF REVIEW

Claims of insufficient evidence are reviewed *de novo*. *United States v. Duran*, 189 F.3d 1071, 1078 (9th Cir. 1999). Whether jury instructions adequately cover the theory of the defense is reviewed *de novo* as well. *United States v. Fejes*, 232 F.3d 696, 702 (9th Cir. 2000). Whether particular evidence falls within the scope of a rule of evidence is also reviewed *de novo*. *United States v. Smith*, 282 F.3d 758, 768 (9th Cir. 2002). A district court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *United States v. Castillo*, 181 F.3d 1129, 1134 (9th Cir. 1999). The district court's findings regarding purposeful discrimination in jury selection are findings of facts entitled to great deference and will be set aside only if clearly erroneous. *United States v.*

*Power*, 881 F.2d 733, 739 (9th Cir. 1989). Claims that a defendant's sentence violates *Apprendi v. New Jersey*, 530 U.S. 466 (2000), are reviewed *de novo*. *Smith*, 282 F.3d at 771.

## III.   DISCUSSION

### A.   Sufficiency of the Evidence

Cruz-Escoto's first argument is that the evidence was insufficient to find him guilty of violating § 1326. Specifically, he argues that he was never free from official restraint because he was apprehended before he passed Agent Viau's permanent post.

**[1]** To prove a violation of § 1326, the prosecution must show that a deported alien entered, attempted to enter, or was found in, the United States without official permission of the government. *See* 8 U.S.C. § 1326. Physical presence alone is insufficient to sustain a conviction of being "found in" the United States. *See, e.g.*, *United States v. Gonzalez-Torres*, 309 F.3d 594, 598 (9th Cir. 2002); *United States v. Pacheco-Medina*, 212 F.3d 1162, 1163-64 (9th Cir. 2000). The government must also prove that the individual "entered the United States free from official restraint at the time officials discovered or apprehended him." *United States v. Ruiz-Lopez*, 234 F.3d 445, 448 (9th Cir. 2000). "The burden is on the government to establish lack of official restraint." *United States v. Bello-Bahena*, 411 F.3d 1083, 1087 (9th Cir. 2005).

**[2]** "An alien is under 'official restraint' if, after crossing the border without authorization, he is 'deprived of [his] liberty and prevented from going at large within the United States.' " *Gonzalez-Torres*, 309 F.3d at 598 (alteration in original) (quoting *United States v. Pacheco-Medina*, 212 F.3d 1162, 1164 (9th Cir. 2000)). Because the concept of official restraint is interpreted broadly, an alien need not be in physical custody of authorities to be officially restrained. *See Ruiz-*

*Lopez*, 234 F.3d at 448. "[T]he restraint may take the form of surveillance, unbeknownst to the alien . . . ." *Id.* (alteration in original) (quoting *Pacheco-Medina*, 212 F.3d at 1164).

**[3]** Whether an alien crosses the border at a designated point of entry or elsewhere also weighs on the consideration of official restraint. "An alien who crosses the border at a designated location and proceeds directly in the manner designated by the government to the border station where he then presents himself to the authorities has not [yet] been 'found in' the United States . . . ." *United States v. Zavala-Mendez*, 411 F.3d 1116, 1121 (9th Cir. 2005). Aliens who climb fences, raft canals, "or otherwise sneak[ ] across the border in some illegitimate manner," *id.* at 1120, are under official restraint only if they are under constant governmental observation "from the moment [they] set foot in this country until the moment of [their] arrest." *United States v. Castellanos-Garcia*, 270 F.3d 773, 775 (9th Cir. 2001).

**[4]** Another rule applies to this latter class of aliens: those who evade government observation *while crossing* the border are deemed to be free from official restraint, regardless of the distance they travel between entry and arrest. *See Bello-Bahena*, 411 F.3d at 1087-88 (no official restraint when defendant first observed *after* he crossed the border); *Castellanos-Garcia*, 270 F.3d at 774-75 (no official restraint even though defendant captured only 100 yards beyond border because Border Patrol agent did not see defendant cross the border). The rule of these cases is that the distance traveled between entry and apprehension is not determinative; rather, the focus is on whether the alien is able to exercise his free will once he has entered this country.

Cruz-Escoto contends that he was never free from official restraint because although he crossed the border, he never made it past the permanent post. He argues that this permanent post is analogous to a designated point of entry because "unless the person succeeds in getting past this post, that per-

son has not successfully and freely entered the United States." Therefore, he reasons, this case falls between the port of entry cases and the other "sneaky entry" cases.

Despite his attempt to portray this case as falling between a port of entry case and a surreptitious entry case, we have never established a middle ground. In *Zavala-Mendez*, we specifically noted only two lines of authority for "found in" cases: the first where aliens present themselves at designated points of entry, and the second where aliens enter surreptitiously. *Zavala-Mendez*, 411 F.3d at 1118. Here, analysis under the designated point of entry cases is inappropriate because Cruz-Escoto neither entered at a designated point of entry nor proceeded in a manner designated by the United States government.

Although the geography involved in this case presents a unique situation, the jury heard sufficient evidence to decide that Cruz-Escoto was free from official restraint. Agent Viau's testimony that he never saw Cruz-Escoto cross the border is significant, but not dispositive, in our inquiry. Under our "surreptitious entry" precedent, his arrest only 100-150 yards from the border is of no consequence since the distance traveled once inside the United States is not the ultimate consideration. *See, e.g.*, *Bello-Bahena*, 411 F.3d at 1087; *United States v. Vela-Robles*, 397 F.3d 786, 789 (9th Cir. 2005); *Castellanos-Garcia*, 270 F.3d at 775. Rather, whether Cruz-Escoto could exercise his free will once inside the United States is the focus of our analysis.

**[5]** A complicating fact in this case is that the geography of the Channel might prevent someone crossing the border from exercising his own free will inside the United States until he passes the permanent post. However, we need not consider that situation here, because there was no evidence that Cruz-Escoto did, in fact, cross the border immediately preceding his arrest. Because he did not testify, the jury might well have determined that Cruz-Escoto was already in this

country and had the ability to exercise his free will inside the United States. We are simply unable to say that there was insufficient evidence for a rational jury to conclude that Cruz-Escoto was free from official restraint.

## B.    Adequacy of the Jury Instructions

Cruz-Escoto's next argument is that the district court erred when: (1) it failed to give his proposed jury instruction with respect to official restraint; and (2) it instructed the jury based on an erroneous reading of the law.

**[6]** "A defendant is entitled to have the judge instruct the jury on his theory of the defense, provided that it is supported by law and has some foundation in the evidence." *United States v. Mason*, 902 F.2d 1434, 1438 (9th Cir. 1990). An instruction is proper " 'even though the evidence may be weak, insufficient, inconsistent, or of doubtful credibility.' " *United States v. Sotelo-Murillo*, 887 F.2d 176, 178 (9th Cir. 1989) (quoting *United States v. Yarbrough*, 852 F.2d 1522, 1541 (9th Cir. 1988), *cert. denied*, 488 U.S. 866 (1988)).

The instructions given to the jury mostly coincided with Cruz-Escoto's proposed instructions. However, the last line of one of Cruz-Escoto's proposed instructions was not included in the final jury instructions:

> Furthermore, when an alien attempts to enter the United States, the mere fact that he may have eluded the gaze of law enforcement, or eluded arrest, for a brief period of time after having come upon United States territory is insufficient, in and of itself, to establish "freedom from official restraint."

Rather, the district court instructed the jury:

> If an alien is under constant surveillance by immigration officers when he entered the United States

and the entire time he is inside the United States, he may not be free from official restraint. On the other hand, if an immigration official did not see the Defendant cross into the United States, then the Defendant would not be under official restraint.

**[7]** Cruz-Escoto's first assignment of error is the district court's refusal to give the last line of his proposed instruction. While his proposed instruction is an accurate statement of the law, *see, e.g., Gonzalez-Torres*, 309 F.3d at 598, *Pacheco-Medina*, 212 F.3d at 1163-64, it is inapplicable to this case. There was never a question of whether the government surveillance amounted to constructive official restraint resulting from brief periods of interruption. Apparently, Cruz-Escoto believes that because a period of time elapsed from the moment he crossed the border until he was first detected, this case is similar to the "interruption" cases such as *Gonzalez-Torres* and *Pacheco-Medina*. However, the rule of those cases applies only where the defendant was observed crossing the border. The rule is inapplicable in this case because Cruz-Escoto *was not* seen crossing the border.

It is for this reason that Cruz-Escoto's second assignment of error is also incorrect. He argues that the last sentence of the final jury instructions misstates the law because it contradicts *Pacheco-Medina* and its progeny, including *Ruiz-Lopez*. However, nothing in *Pacheco-Medina* or subsequent cases has changed the settled rule that if an alien sneaks across the border undetected, he is generally deemed to be free from official restraint regardless of the distance he travels in the United States. *See Bello-Bahena*, 411 F.3d at 1087-88; *Castellanos-Garcia*, 270 F.3d at 775-76.

His contention that *Ruiz-Lopez* is a case where the defendant was not observed crossing the border is misguided. Although the immigration officer in that case could not specifically recall observing the defendant cross the border, his general practice of closely monitoring the border and immedi-

ately interviewing suspected illegal aliens provided sufficient testimony of habitual practice to permit the inference that the defendant was monitored while crossing the border. *Ruiz-Lopez*, 234 F.3d at 448-49.

## C.   Exclusion of Opinion Testimony

Cruz-Escoto argues that the district court violated his Fifth and Sixth Amendment rights when it excluded the testimony of a defense witness that would have impeached the government's central witness.

**[8]** The Constitution provides an accused with "a meaningful opportunity to introduce relevant evidence on his behalf." *Menendez v. Terhune*, 422 F.3d 1012, 1033 (9th Cir. 2005); *see also Crane v. Kentucky*, 476 U.S. 683, 690 (1986). However, "a trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury." *Menendez*, 422 F.3d at 1033. In considering whether the exclusion of evidence violates due process, this court considers "the probative value of the evidence on the central issue . . . ." *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir. 1985).

Cruz-Escoto sought to impeach Agent Viau's testimony that his vehicle was facing south, but that he was continually looking west. He argues that this testimony enabled the government to argue that Agent Viau did not see Cruz-Escoto cross the border and therefore was never free from "official restraint" because he was not continually under surveillance.

Cruz-Escoto attempted to introduce testimony of Robert Castillo, a defense witness trained in surveillance. Cruz-Escoto's counsel proffered that Castillo "would testify that, when you're doing surveillance, it's very difficult to have your vehicle pointed in one direction and then to constantly be looking in another, which was essentially the testimony of the agent." Thus, Cruz-Escoto argues, Agent Viau must have

been looking toward the gap in the border fences, which was the direction his vehicle was pointing, and he must have seen Cruz-Escoto cross the border.

**[9]** The district court did not violate Cruz-Escoto's Fifth or Sixth Amendment rights by excluding Castillo's testimony. The court decided that the evidence was irrelevant because it was within the understanding of a common juror. *See* Fed. R. Evid. 702. Moreover, this ruling was not an abuse of discretion under Fed. R. Evid. 403.

### D.   Evidence of Prior Removals

Cruz-Escoto's next argument is that the district court improperly admitted evidence of his previous illegal entries and removals. He argues that this evidence violates Federal Rules of Evidence 401, 403, and 404(b).

**[10]** While Rule 404(b) does prohibit the admission of "other crimes, wrongs, or acts" to prove the propensity of a defendant, evidence that is a necessary element of the crime charged is not considered "[e]vidence of other crimes, wrong, or acts" within the meaning of the Rule. *United States v. Campbell*, 774 F.2d 354, 356 (9th Cir. 1985) (alteration in original) (qutoing Fed. R. Evid. 404(b)). Therefore, evidence showing that Cruz-Escoto had previously been deported is not Rule 404(b) evidence because the government had to prove this element of the crime. *See* 8 U.S.C. § 1326(a)(1).

**[11]** Cruz-Escoto argues that the government's use of multiple prior deportations, when proof of only one was necessary, constitutes reversible error. We find no error in permitting this evidence because in other contexts we have permitted the introduction of more than one predicate act to establish an element of the crime. *See United States v. Weiland*, 420 F.3d 1062, 1078 (9th Cir. 2005) (finding harmless error in the use of four prior felony convictions to establish

defendant's status as a felon under 18 U.S.C. § 922(g)(1)), *cert. denied*, 126 S. Ct. 1911 (2006).

Moreover, the district court gave two limiting instructions to minimize the potential prejudice. *See United States v. Basinger*, 60 F.3d 1400, 1408 (9th Cir. 1995). The first limiting instruction informed the jury that it could only use the 2000 deportation to show citizenship, absence of mistake or accident, and for deportation, which was an element of the offense. The second limiting instruction was given after closing arguments and informed the jury again of the limited purpose of the "other acts" evidence.

### E.   *Batson* Allegations

Cruz-Escoto contends that the government violated the Equal Protection Clause because it impermissibly used peremptory challenges to exclude two Hispanic potential jurors.

[12] The Fourteenth Amendment prohibits racial discrimination in the jury selection process. *See Batson v. Kentucky*, 476 U.S. 79 (1986). A defendant who objects to the use of peremptory challenges carries the burden of establishing a prima facie showing of unconstitutional discrimination. *Id.* at 93-96. To make such a showing, the defendant must first show that: (1) he is a member of a cognizable racial group; (2) the government used peremptory challenges to remove members of that racial group; and (3) the "facts and any other relevant circumstances raise an inference" that the peremptory challenge was motivated by an impermissible factor, such as race. *Id.* at 96.

[13] If a defendant makes a prima facie showing of discrimination, the burden shifts to the government to offer race-neutral reasons for exclusion of a particular race. *Id.* at 94. "The prosecutor's explanation, to satisfy *Batson*, need only be facially valid, it need not be persuasive or even plausible so

long as it is race-neutral." *United States v. Gillam*, 1678 F.3d 1273, 1278 (9th Cir. 1999); *see also Purkett v. Elem*, 514 U.S. 765, 767-68 (1999) (per curiam). Finally, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." *Purkett*, 514 U.S. at 767.

The government contends that Cruz-Escoto did not make a prima facie showing of discrimination because he failed to produce any facts or other relevant circumstances that could raise an inference of impermissible discrimination. In his objection, Cruz-Escoto stated that "[t]here are two hispanics who were stricken by the government, number 23 and 24," and that "I don't think that's the reason they struck her." The government argues that this is insufficient to establish a prima facie showing. However, the district court requested and accepted the government's reasons for excluding the two Hispanic jurors. Thus, the issue of whether Cruz-Escoto made a prima facie showing of discrimination is moot. *See Kesser v. Cambra*, 465 F.3d 351, 381 (9th Cir. 2006) (" '[O]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot.' " (quoting *Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality opinion)).

**[14]** Assuming, as the district court did, that Cruz-Escoto made a prima facie showing of discrimination, his claim still fails because the government articulated a valid, race-neutral justification for excluding the potential jurors. The government rationalized excluding the two Hispanic jurors because they — or their sons, depending on which version of transcript is accurate[3] — were unemployed. Cruz-Escoto argues

---

[3]The government alleges, and Cruz-Escoto does not contest, that there is an error in the trial transcript. The transcript reflects the government's race-neutral justification as: "On 24, the same as 23. Her sons are both

that this reason is insufficient to rebut a prima facie *Batson* showing. However, our precedent contradicts this contention. *See Gillam*, 167 F.3d at 1278 (finding that unemployment for one year was a race-neutral explanation).

**[15]** Moreover, ample evidence supports the district court's conclusion that Cruz-Escoto did not establish purposeful racial discrimination. The seated jury included two Hispanics who were not struck by the government. *See Turner v. Marshall*, 121 F.3d 1248, 1254 (9th Cir. 1997) (finding fact that jury included minorities to be indicative, but not dispositive, of nondiscriminatory motive); *United States v. Chinchilla*, 874 F.2d 695, 698 n.4 (9th Cir. 1989) (noting that "the willingness of a prosecutor to accept minority jurors weighs against the findings of a prima facie case"). Also, the challenges at issue only constituted two of the government's six peremptory challenges. *See United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994) (considering that the "government's other peremptory challenges did not suggest a general pattern of discrimination against racial minorities" in the *Batson* analysis). Finally, the defense also struck one of the two jurors in dispute.

## F. *Apprendi* Challenge to Sentence

Cruz-Escoto's final claim is that the district court improperly increased his sentence above the statutory maximum. Pursuant to 8 U.S.C. § 1326(b)(2), the district court sentenced Cruz-Escoto above the two-year statutory maximum because it found that he had previously been convicted of two felonies — a 1994 drug trafficking charge and a 1996 sale of cocaine

employed — I assume only one is at issue." The government contends that based on its review of the official recording, the prosecutor stated "The reason is they're both unemployed." As the government points out, this likely seems to be an error because neither juror referred to any "sons" and the two phrases do sound similar. The government also alleges that the "employed/unemployed" difference in the transcript is error as well.

charge. According to Cruz-Escoto, this increase violates the Supreme Court's ruling in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because he did not admit that he had previously been convicted nor did the jury make such a finding.

[16] Any fact that increases a sentence above the statutory maximum must be admitted by the defendant or proved to a jury beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490. However, Cruz-Escoto's argument fails because *Apprendi* specifically exempts recidivism enhancements based on prior convictions from its holding. *Id.* at 490 ("*Other than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (emphasis added)).

Cruz-Escoto's contention that *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), requires a defendant's admission of prior conviction to trigger a § 1326 recidivism enhancement is contrary to both the history of the recidivism enhancement and our precedent. *See id.* at 227 (noting that recidivism "is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence"); *United States v. Yanez-Saucedo*, 295 F.3d 991, 993 (9th Cir. 2002) ("[N]owhere does *Apprendi* limit *Almendarez-Torres* to cases where a defendant admits prior aggravated felony convictions on the record.") (quotation and citation omitted).

[17] Moreover, we have repeatedly upheld statutory maximum increases based on the same recidivism enhancement in this case. *See, e.g.*, *United States v. Cortez-Arias*, 403 F.3d 1111, 1114 n.8 (9th Cir. 2005).

**AFFIRMED.**

TASHIMA, Circuit Judge, dissenting:

I respectfully dissent from Part III.B of the majority opinion and from the judgment. Part III.B rejects Cruz-Escoto's contention that the jury instructions inadequately covered his theory of the defense. The majority misconstrues our cases and, consequently, interprets the doctrine of "official restraint" far too narrowly. Although the majority acknowledges in Part III.A that "the geography of the Channel might prevent someone crossing the border from exercising his own free will inside the United States until he passes the permanent post," Maj. Op. at 2056, inexplicably, it ignores this possibility in its discussion of Cruz-Escoto's requested jury instructions. The jury instructions requested by Cruz-Escoto would have allowed the jury to consider his theory that the "geography of the Channel," including the permanent Border Patrol post, placed him under official restraint, even if he was not seen crossing the border. But the jury instructions actually given foreclosed consideration of Cruz-Escoto's theory of the case.

"It is settled law that a defendant is entitled to have the judge instruct the jury on his theory of the case, provided that it is supported by law and has some foundation in the evidence. A failure to instruct a jury upon a legally and factually cognizable defense is not subject to harmless error analysis." *United States v. Sarno*, 73 F.3d 1470, 1485 (9th Cir. 1995) (citations, internal quotation marks, and brackets omitted).

Cruz-Escoto requested a jury instruction stating that, "[W]hen an alien attempts to enter the United States, the mere fact that he may have eluded the gaze of law enforcement, or eluded arrest, for a brief period of time after having come upon United States territory is insufficient, in and of itself, to establish 'freedom from official restraint.' " The district court rejected this proposed instruction and gave the following instruction in its place: "If an alien is under constant surveillance by immigration officers when he entered the United

States and the entire time he is inside the United States, he may not be free from official restraint. On the other hand, if an immigration official did not see the Defendant cross into the United States, then the Defendant would not be under official restraint."

The court's instruction precluded the jury from considering Cruz-Escoto's theory of the defense, if the jurors credited the agent's testimony that he did not see Cruz-Escoto cross the international border. Cruz-Escoto had argued that because of the configuration of the Channel and the fact that a Border Patrol agent is permanently stationed there to monitor the Channel, "unless the person [attempting entry] succeeds in getting past this [Border Patrol] post, that person has not successfully and freely entered the United States . . . . The mere fact that the border patrol agent at his post did not see the actual crossing of the line or the fence is not dispositive in this case . . . ."

Contrary to the majority, I conclude that Cruz-Escoto's theory of the defense accurately represents the law regarding freedom from official restraint. Even if the Border Patrol agent did not see Cruz-Escoto cross the border, the configuration of the Channel and the permanent Border Patrol post at that location placed Cruz-Escoto under official restraint from the moment he crossed into the United States until he was apprehended. Therefore, Cruz-Escoto was entitled to have the jury consider his theory.

I disagree with the majority's assertion that, under our jurisprudence, official restraint requires that a government official actually witness the alien crossing the international boundary line, if the crossing occurs away from an official port of entry. The majority derives this rule from the fact that in other Ninth Circuit cases dealing with official restraint of aliens "sneaking across" the border, the aliens were observed in the act of crossing. *See* Maj. Op. at 2055 (citing *United States v. Bello-Bahena*, 411 F.3d 1083 (9th Cir. 2005), and

*United States v. Castellanos-Garcia*, 270 F.3d 773 (9th Cir. 2001)).

But the concept of official restraint that underlies our official restraint case law is not so limited. The idea that an alien has not successfully entered the country until he is free from official restraint is rooted in the notion that an alien who is in constructive government custody at all times has not really "made it in" to the United States.

We first adopted the notion that entry requires "physical presence . . . accompanied by freedom from official restraint" in *United States v. Oscar*, 496 F.2d 492, 493 (9th Cir. 1974) (citing *United States v. Vasilatos*, 209 F.2d 195 (3d Cir. 1954); *In re Dubbiosi*, 191 F. Supp. 65 (E.D. Va. 1961)). In *Oscar*, two aliens who attempted to enter by lying to inspectors at a port of entry, claiming that they were U.S. citizens, had not committed the crime of illegal entry because they were "never free from the official restraint of the customs officials at the San Ysidro Port of Entry." 496 F.2d at 493. In *United States v. Aguilar*, 883 F.2d 662, 681-82 (9th Cir. 1989), we affirmed that "surveillance prior to an arrest is official restraint because the alien 'lacks the freedom to go at large and mix with the population.' " (quoting *Matter of Pierre*, B.I.A. Interim Dec. No. 2239 (Oct. 5, 1973) (later reported at 14 I. & N. Dec. 467 (B.I.A. 1973))). As we noted in *Aguilar*, the concept of "official restraint" is premised on "the theory that the alien is in the government's constructive custody at the time of physical entry." 883 F.2d at 683. In *Aguilar*, we held that the alien was not under continuous official restraint because daily visits to her home by an undercover government agent over a period of months did not amount to constructive custody over that entire period. *Id.*

Thus, the touchstone of official restraint is whether the alien was *actually* "free to go at large and mix with the population." *Id.* at 682. Because the concept is rooted in the notion of constructive custody, the appropriate inquiry is whether the

government retains effective control over the alien. *Cf. Black's Law Dictionary* 412, 1183 (8th ed. 2004) (defining custody as "care and control of a thing or person for inspection, preservation, or security" and physical custody as "[c]ustody of a person (such as an arrestee) whose freedom is directly controlled and limited"). While it is true that our cases find that even momentary freedom from government control suffices to establish freedom from official restraint, the controlling question remains whether "an alien is able to exercise his free will subsequent to physical entry." *Aguilar*, 883 F.2d at 683 (citing *United States v. Martin-Plascencia*, 532 F.2d 1316 (9th Cir. 1976)).

In cases where the alien crosses the border away from a port of entry, constructive government custody is usually effected through government surveillance. That is the reason that other Ninth Circuit cases dealing with surreptitious border crossings have involved aliens who are seen, either directly or by video or other remote device, as they cross the border. But there is no rule that the only means of achieving official restraint over, or constructive custody of, an alien crossing the border is through actual observation by government officials.[1]

At the area of the Channel where Cruz-Escoto was apprehended, the physical topography along with the degree of

---

[1]The port of entry cases, while not controlling, also illustrate that the key to official restraint is the criterion of government control over the alien, not continuous government observation. Where an alien enters the country at an official port of entry, whether at an airport or a land border, the alien who follows government-designated procedures is not deemed free from official restraint until she exits the customs inspection area, because until then she is not "free to exit the [port of entry] and 'go at large and mix with the general population.' " *Sidhu v. Ashcroft*, 368 F.3d 1160, 1165 (9th Cir. 2004) (quoting *Correa v. Thornburgh*, 901 F.2d 1166, 1172 (2d Cir. 1990)); *see also United States v. Zavala-Mendez*, 411 F.3d 1116, 1120-21 (9th Cir. 2005) (relying on the idea that an alien who presents herself at a border station is not "found in" the United States within the meaning of 8 U.S.C. § 1326(a)).

government control exerted over the area created a constructive custody situation — without any necessity that the agent have actually watched Cruz-Escoto step over the painted boundary line.[2] The Channel is equivalent to a brightly lit, high-walled corridor crossing the border, with a permanent Border Patrol post at one end. It is fenced along both sides once it enters the United States. Along the south bank,[3] there is double fencing, with an inner fence 15 feet in height and an outer fence of eight feet; a high fence also runs along the north bank. Stadium-style lighting illuminates the Channel at night. An agent sits in a marked vehicle on the north bank of the Channel monitoring the Channel 24 hours a day, seven days a week. Thus, if Cruz-Escoto did cross the border by moving north within the fenced interior of the Channel, he was at all times within this highly-controlled, continuously-monitored space. A jury could justifiably find that he was under effective government restraint while in the United States by virtue of the high fencing around him and the constant monitoring of the corridor by Border Patrol.[4]

The unique physical configuration of the Channel distinguishes this case from cases such as *Bello-Bahena* and *Castellanos-Garcia*, where we held that aliens discovered only a short distance from the border could be deemed to have entered "free from official restraint." There was no indication in those cases that the aliens' freedom of movement had been curtailed in any way. Bello-Bahena was found "hiding in some brush" a mile from the border, 411 F.3d at 1086;

---

[2]There is no border fence crossing the Channel but the international boundary is marked by a yellow painted line across the cement bottom of the Channel. When the Channel is dry, as it was at the time of Cruz-Escoto's crossing, the line is readily visible across the width of the Channel.

[3]Immediately after the Channel enters the United States, it turns and runs west toward the Pacific.

[4]Thus, the Channel is the virtual equivalent of a tunnel under the border with a Border Patrol agent stationed at the end of the tunnel as it emerges on the U.S. side of the border.

Castellanos-Garcia was discovered "walking north at least 100 yards from the border" after having scaled the border fence, 270 F.3d at 774. The majority cites these cases for the proposition that "those who evade government observation *while crossing* the border are deemed to be free from official restraint, regardless of the distance they travel between entry and arrest." Maj. Op. at 2055 (emphasis in the original). Again, the majority has mistakenly fixated on the criterion of government observation at the precise moment of crossing. The aliens in those cases were not in a contained area, and there was no indication that any form of government control had been exerted over them from the time they crossed the border until they were apprehended. Since they were found some distance from the border, this was sufficient to show that each had sufficient opportunity to "exercise his free will" free of government control while within the United States. However, *Bello-Bahena* and *Castellanos-Garcia* do *not* establish a general rule that actual government observation is the only means of establishing official restraint over an alien who crosses the border surreptitiously. What remains the controlling rule is whether the "alien is able to exercise his free will subsequent to physical entry." *Aguilar*, 883 F.2d at 683.

This case also differs from cases where aliens, in the course of attempting to evade official detection, found themselves in natural environments from which escape was difficult, such as a gorge or very thick brush. *See United States v. Vela-Robles*, 397 F.3d 786, 789 (9th Cir. 2005) (detection by seismic sensor as alien entered natural gorge did not amount to observation or surveillance for purpose of showing official restraint and alien was thus not in the "constant visual or physical grasp of governmental authorities" after crossing border); *United States v. Hernandez-Herrera*, 273 F.3d 1213, 1216, 1219 (9th Cir. 2001) (alien who was seen crossing the border, but then fled into thick brush "from which there was no escape," was no longer under official restraint once he left agents' sight). The government control exercised over a natural gorge or an area of thick brush, even if agents are stationed

immediately outside waiting to catch anyone who emerges, does not nearly approach the tunnel-like configuration of the Channel, where a government agent continuously monitors a fenced-in, well-lit space.

Thus, our case law supports Cruz-Escoto's theory of the defense. Further, the evidence in this case supported his theory.[5] The physical configuration of the Channel and the location of the Border Patrol permanent post are undisputed. The agent testified that he did not see Cruz-Escoto until he was 100-150 yards up the Channel, meaning that Cruz-Escoto could have crossed the border either by traveling north within the fenced interior of the Channel or by scaling the border fence at some other point and later emerging into the Channel. If the former occurred, for the reasons outlined above, Cruz-Escoto would have been under official restraint the entire time that he was in the United States. Because the evidence left both possibilities open, there was a foundation in the evidence for Cruz-Escoto's theory and he was thus entitled to an instruction that adequately covered the theory.[6] *Sarno*, 73 F.3d at 1485. As

---

[5]While recognizing that Cruz-Escoto's requested instruction was a correct statement of the law, the majority states that there was no foundation for it here because "[t]here was never a question of whether the government surveillance amounted to constructive official restraint resulting from brief periods of interruption." Cruz-Escoto's theory, however, relied on the idea that the presence of a government agent observing the Channel, together with the topography of the Channel itself, placed him in constructive custody — even if the agent did not actually observe Cruz-Escoto until he was already within the United States. Therefore, it was important to his defense that the jury be instructed that, in the circumstances of the topography of the Channel, brief periods of interruption in the government surveillance while Cruz-Escoto was still in the Channel, did not preclude a finding of official restraint.

[6]I agree with the majority that a rational fact-finder could have found that Cruz-Escoto entered free from official restraint, because it is unclear whether Cruz-Escoto entered the United States by moving up the lighted interior of the Channel or by scaling the international boundary fence at some other point and only later scaling the inner Ballard fence to enter the Channel interior. The agent's testimony that Cruz-Escoto was running

the majority acknowledges, "the geography involved in this case presents a unique situation." Maj. Op. at 2056. And while I agree that "the jury heard sufficient evidence to decide that Cruz-Escoto was free from official restraint," *id.* at 2056, that was not the only possible interpretation of the evidence. Unfortunately, however, the district court gave an instruction which precluded the jury from even considering Cruz-Escoto's theory, even if the jury accepted the agent's testimony.

Because Cruz-Escoto was deprived of the opportunity to present his theory of the defense to the jury, I would reverse the judgment of conviction and remand for a new trial. I respectfully dissent.

---

northwest, as if he had come from the southeast, strongly suggests that Cruz-Escoto came across the border within the Channel. The agent also testified, however, that it is common for aliens to scale the border fence at other points along the Channel, where there are more shadows. It is for this reason that I agree with the majority's rejection of Cruz-Escoto's claim that his motion for acquittal should have been granted.