**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 23-3262 |
| *Plaintiff - Appellee,* | D.C. No. 4:23-cr-00139-JAS-MAA-1 |
| v. | |
| WARDY ALFONSO LIBERATO | |
| *Defendant - Appellant.* | OPINION |

Appeal from the United States District Court
for the District of Arizona
James Alan Soto, District Judge, Presiding

Argued and Submitted March 24, 2025
Phoenix, Arizona

Filed July 8, 2025

Before: Marsha S. Berzon and Mark J. Bennett, Circuit
Judges, and John R. Tunheim, District Judge.[*]

Opinion by Judge Berzon;
Dissent by Judge Bennett

---

[*] The Honorable John R. Tunheim, United States District Judge for the
District of Minnesota, sitting by designation.

**SUMMARY**[**]

**Criminal Law**

The panel reversed Wardy Alfonso Liberato's conviction under 8 U.S.C. § 1326(a) for entering and being found in the United States after having been removed, and remanded for entry of a judgment of acquittal.

The only issue on appeal was whether the government's evidence was sufficient to establish that Liberato was free from official restraint at some point before his apprehension, as required for conviction under § 1326. In determining whether the government met its burden, the question is whether the evidence presented at trial supports beyond a reasonable doubt not just speculation, but logical conclusion, that the defendant was at least briefly unobserved and unrestrained while within U.S. territory. The panel concluded that the evidence was insufficient, where there was no evidence that Liberato's group was ever anywhere other than immediately next to the border fence, and there was no testimony about where Liberato was or what he was doing when he was first observed in the United States. Based on the limited evidence presented, no rational jury could have inferred beyond a reasonable doubt that Liberato was at any point free from official restraint.

Judge Bennett dissented. He wrote that under the sufficiency-of-the-evidence test set forth in *Jackson v. Virginia*, the government proved beyond a reasonable doubt that Liberato evaded government detection for at least a brief

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

period after illegally entering the United States. The majority reaches a contrary conclusion because it fails to consider all the evidence and to draw all reasonable inferences in the government's favor, and improperly suggests that, in reviewing the sufficiency of the evidence, the panel should consider evidence that was *not* presented at trial.

## COUNSEL

Christina M. Cabanillas (argued), Deputy Appellate Chief; Gary M. Restaino, United States Attorney; Office of the United States Attorney, United States Department of Justice, Tucson, Arizona; for Plaintiff-Appellee.

Francisco León (argued), Law Office of Francisco León, Tucson, Arizona, for Defendant-Appellant.

**OPINION**

BERZON, Circuit Judge:

Wardy Alfonso Liberato, a Dominican removed from the United States in 2007, was part of a group of suspected noncitizens arrested next to the U.S.-Mexico border fence in January 2023. A jury convicted him of "enter[ing]" and being "found in the United States of America after having been . . . removed therefrom" in violation of 8 U.S.C. § 1326(a). Presence in the United States does not violate Section 1326(a) "until physical presence is accompanied by freedom from official restraint." *United States v. Pacheco-Medina*, 212 F.3d 1162, 1164 (9th Cir. 2000) (quoting *United States v. Oscar*, 496 F.2d 492, 493 (9th Cir. 1974)). Liberato appeals his conviction, arguing that the government did not meet its burden of proving beyond a reasonable doubt that he was ever free from official restraint before he was apprehended. We agree and reverse.

**I.**

The only issue in this appeal is whether the government's evidence was sufficient to establish that Liberato was free from official restraint at some point before his apprehension. We therefore begin by recounting in detail the evidence presented at his trial.

Liberato and his group were arrested just inside the U.S.-Mexico border fence around 20 miles from the nearest port of entry. The region is "very rugged . . . desert" with "no shelter," "no water," and "very limited cell phone service." Two Border Patrol agents were present at the scene of Liberato's arrest: Agent Miguel Lastra and Agent Noe Mondragon. Agent Mondragon testified at Liberato's trial.

Agent Lastra did not. A third agent who was not present at the arrest, Agent Kyle Hall, also testified.[1]

Agent Hall was the government's first witness. He was not present for Liberato's arrest but had "familiarized [him]self" with Liberato's administrative file and a narrative arrest report prepared by Agent Lastra. Agent Hall testified that the first law enforcement observation of Liberato's group had been through a surveillance tower camera. He testified that this camera was a powerful infrared camera with a range of at least one mile. He did not say on which side of the border the group was observed by this camera or where the group was seen in relation to where they were later detained.

Agent Mondragon testified next. He gave the following account:

The day of Liberato's arrest, Agent Mondragon was out on patrol. While driving, he encountered a group of suspected undocumented noncitizens—a different group than Liberato's. Agent Mondragon "asked for help," and Agent Lastra "came to assist" him. But while Agent Lastra was in "his vehicle" "on his way out," he "ran into a second group"—Liberato's group. Agent Lastra "notified [Agent Mondragon] . . . that he had encountered another group." Agent Mondragon finished up with the group he had initially encountered and then went to assist Agent Lastra with Liberato's group.

Eventually—Agent Mondragon did not remember "how long it took" after he was first notified—Agent Mondragon

---

[1] The government's third and final witness was a fingerprint specialist who had taken Liberato's fingerprints after his arrest and testified that they matched the fingerprints from his original removal records.

"made it out to" Agent Lastra's location. He was not sure whether Agent Lastra had begun "processing" the group—*i.e.*, going through their belongings, collecting biographical information like name and age, and reviewing any documentation like passports—by the time he arrived, although he said that Agent Lastra "probably got started" before he got there. Agent Mondragon was not sure whether Agent Lastra had already processed Liberato by the time he arrived, and he could not remember whether he or Agent Lastra had been the one to process Liberato.

Agent Mondragon did not remember where Liberato's group was located or "how they were" when he arrived. At some point, Agent Mondragon took a picture depicting the group with their backs against the border fence. He stated that the picture was taken in "Zone 2," "where the group was encountered," although he could not recall if he took the picture when he first arrived, while he and Agent Lastra were processing the group, or after processing was complete. He testified that the standard "process" when Border Patrol agents encounter a group is to "put the group or tell them to get near the fence" and "put their belongings in front of them" before the agents start processing. But he did not indicate that Liberato's group had been moved in this manner or, if they were, where they had been located before moving.

Agent Mondragon testified that the camera closest to the spot where Liberato was arrested was "on the hilltop further east." He testified that the camera would "have trouble focusing in" on the location of the arrest because "it's just so far." He also testified that he did not think it possible for the camera to "see where this arrest took place because of the valleys, because . . . there are cactus, there are trees, there's brush in the way of the border road from the hillside." As a

result, he testified that he did not "believe" the camera would "be able to see the area where this arrest took place." The jury asked Agent Mondragon to clarify his camera testimony. Agent Mondragon then stated that Liberato and his group "were not in view of any camera," although he did not elaborate on how he knew that.

The jury also asked Agent Mondragon if he knew how Liberato's group had come into the United States. Agent Mondragon testified that it was "hard to tell how they came in." He then said that "typically" groups "will either cut a section of the fence" and "push it through . . . or they will break open a door." He noted that "sometimes they'll try to hide" the fence opening by "clos[ing] it up." Agent Mondragon was asked whether he examined the fence near where Liberato's group was arrested to look for "places where people could have entered or had entered." Agent Mondragon did not say whether he did or not, only that he "probably did and if [he] didn't report it, it's probably because [he] didn't find where the breach was."

Again, Agent Lastra did not testify. Initially, the government had identified him as a trial witness. But before trial, the government decided not to call him and informed Liberato of the change in plans. The government told the district court that it "chose not to call him for our own reasons." Liberato did not call Agent Lastra (or anyone else) as a witness.

Because Agent Lastra did not testify, the evidence presented at trial was not a firsthand account, and there was no testimony concerning where and how Agent Lastra first came across Liberato and his group. Agent Mondragon did not provide any details about what, if anything, Agent Lastra told him about his initial encounter when he first summoned

Agent Mondragon for assistance. Agent Lastra had prepared a brief report on the encounter, which Agent Hall had reviewed. But the district judge sustained a hearsay objection when Liberato's counsel asked Agent Hall about the report's contents.

The jury returned a guilty verdict. The district court denied Liberato's motion for judgment of acquittal and entered a judgment of conviction. Liberato timely appealed.

## II.

We review de novo whether sufficient evidence supports a conviction. *United States v. Phillips*, 929 F.3d 1120, 1123 (9th Cir. 2019). Our review is governed by the two-step inquiry set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc).

First, we "consider the evidence presented at trial in the light most favorable to the prosecution." *Nevils*, 598 F.3d at 1164. If the "record . . . supports conflicting inferences," we "presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* (quoting *Jackson*, 443 U.S. at 326).

"Second, after viewing the evidence in the light most favorable to the prosecution," we "determine whether this evidence, so viewed, is adequate to allow '*any* rational trier of fact to find the essential elements of the crime beyond a reasonable doubt.'" *Nevils*, 598 F.3d at 1164 (quoting *Jackson*, 443 U.S. at 319) (alterations omitted). "At this second step, . . . a reviewing court may not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt,' only whether '*any'*

rational trier of fact could have made that finding." *Id.* (citations omitted) (quoting *Jackson*, 443 U.S. at 318–19).

"More than a 'mere modicum' of evidence is required to support a verdict." *Nevils*, 598 F.3d at 1164 (quoting *Jackson*, 443 U.S. at 320). Even when construed in the government's favor, the evidence "may still be so supportive of innocence that no rational juror could conclude that the government proved its case beyond a reasonable doubt," or it "may be insufficient to establish every element of the crime." *Id.* at 1167. "We have held, for example, that evidence is insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the government's case, or where there is a 'total failure of proof of a requisite' element. *Id.* (citations and alterations omitted) (quoting *Briceno v. Scribner*, 555 F.3d 1069, 1079 (9th Cir. 2009)).

## III.

Applying the *Jackson* inquiry as elucidated in *Nevils*, we consider the evidence in the prosecution's favor to determine whether any rational juror could have concluded that the government proved beyond a reasonable doubt that Liberato was free from official restraint at any point after physically entering the United States.

## A.

Only one element of a Section 1326(a) violation is at issue in this appeal: the requirement that the defendant must have been free from official restraint at some point between physically entering U.S. territory and being apprehended. The freedom-from-restraint requirement does not appear in the text of Section 1326(a), which, with some exceptions, makes it a crime for a noncitizen who has previously been

removed to "enter[], attempt[] to enter, or [be] found in, the United States." 8 U.S.C. § 1326(a). Instead, the requirement is embedded in the legal concept of entry.

We explored the origins of this requirement in *Pacheco-Medina*. 212 F.3d at 1163–66. In that case, the defendant and two others were detected by a surveillance camera as they scaled the U.S.-Mexico border fence. *Id.* at 1163. The camera monitor alerted a Border Patrol agent on bike patrol, who responded immediately and arrived just as the defendant and his companions landed. *Id.* The defendant began running and was chased by the patrol agent, who captured the defendant and took him into custody within a few yards of the border. *Id.*

We reversed the defendant's conviction under Section 1326(a), concluding that "because he was never free from official restraint, he did not commit the crime of being found in the United States." *Pacheco-Medina*, 212 F.3d at 1166. We emphasized that "entry" or being "found in" the United States within the meaning of Section 1326(a) requires more than just "physical presence" in U.S. territory. *Id.* at 1163. Legal entry also requires freedom: Somebody who has physically crossed the border has not "entered" the United States for purposes of this statute until he has the "freedom to go at large and mix with the population," *id.* at 1164 (quoting *In re Pierre*, 14 I. & N. Dec. 467, 469 (B.I.A. 1973))—in other words, the ability to "exercis[e] . . . free will within the United States," *United States v. Hernandez-Herrera*, 273 F.3d 1213, 1219 (9th Cir. 2001).

Our illegal reentry cases make clear that a noncitizen does not have the requisite freedom and thus has not "entered" the United States under Section 1326(a) if he is under "official restraint," including "constant observation or

surveillance from the moment of his [physical] entry to the time of his capture." *United States v. Castellanos-Garcia*, 270 F.3d 773, 775 (9th Cir. 2001). A person "does not have to be in the physical custody of the authorities to be officially restrained; rather, the concept of official restraint is interpreted broadly." *Hernandez-Herrera*, 273 F.3d at 1219; *see also Pacheco-Medina*, 212 F.3d at 1165 n.5 (distinguishing seizure for constitutional purposes from official restraint for purposes of Section 1326). "[O]fficial restraint includes . . . governmental observation or surveillance." *United States v. Bello-Bahena*, 411 F.3d 1083, 1087 (9th Cir. 2005). If a would-be entrant remained "in the visual or physical grasp of the authorities at all times" after physically crossing the border, he never escaped "the government's constructive custody" and thus never "entered" the United States within the meaning of Section 1326(a). *Pacheco-Medina*, 212 F.3d at 1165 (quoting *United States v. Aguilar*, 883 F.2d 662, 683 (9th Cir. 1989)). "Visual grasp" includes observation by camera, *see Pacheco-Medina*, 212 F.3d at 1163, but it does not extend to non-visual forms of automatic detection, such as seismic sensors, *see United States v. Vela-Robles*, 397 F.3d 786, 789 (9th Cir. 2005).

A "brief" lapse in observation or restraint is enough to mean that an individual has legally entered the country. *Bello-Bahena*, 411 F.3d at 1087. This proposition is true if the lapse occurs *while* a noncitizen is crossing the border. *United States v. Cruz-Escoto*, 476 F.3d 1081, 1085–86 (9th Cir. 2007). And it is also true if the lapse occurs at any point *after* a noncitizen has physically entered the country but before she is apprehended. *See, e.g.*, *Hernandez-Herrera*, 273 F.3d at 1216, 1219.

We have held that "a split second" of evading observation does not render a noncitizen unrestrained. *Pacheco-Medina*, 212 F.3d at 1163. Generally, though, surveillance or observation must be "continuous" or "[c]onstant" for a Section 1326(a) violation to be precluded. *Bello-Bahena*, 411 F.3d at 1087.

## B.

Critically for this case, "[t]he burden is on the government to establish lack of official restraint." *Bello-Bahena*, 411 F.3d at 1087. As our cases illustrate, the evidence presented at trial must support not just the possibility but the logical inference—beyond a reasonable doubt—that the defendant was at least briefly free from official restraint while within U.S. territory.

In *Castellanos-Garcia*, for example, we affirmed a Section 1326(a) conviction. 270 F.3d at 778. In that case, a Border Patrol agent "discovered" the defendant "walking north at least 100 yards from the border." *Id.* at 774. The agent "had not seen" the defendant before that encounter. *Id.* The agent testified that he "had just come upon" the defendant, and "had not been alerted to [his] presence by anything or anyone else." *Id.* The district court did not require the agent to answer questions about the location of sensing devices in that area because there was no evidence he had obtained any information from a sensor. *Id.* There was no other evidence about the defendant's "exact point of entry, the placement of sensing devices," or whether the defendant "had been under observation from the moment of his entry to the moment of his capture." *Id.* at 774–75.

We concluded that the evidence was sufficient to establish lack of official restraint. We emphasized that the Border Patrol agent had testified that he "simply came upon"

the defendant at least 100 yards from the border and had not seen him come across the border. *Castellanos-Garcia*, 270 F.3d at 775. We noted that there was no evidence suggesting that the Border Patrol agent had relied on sensor data or other information to locate the defendant. *Id.* And, we concluded, "[t]here was not a scintilla of evidence" to support the defendant's theory that some other agent in the area "might have seen him and had him under observation"; the government was not required to come forward with additional evidence on lack of observation where "all [the defendant] offered was a free floating speculation that he might have been observed the whole time." *Id.* at 776. At the same time, we kept open the possibility that the government might be required to "rebut" "an evidence-based claim" that "a person other than the capturing agent was observing" the defendant "but did not tell the agent about that." *Id.* at 776 & n.1.

In *Bello-Bahena*, we similarly concluded that the evidence was sufficient to support a Section 1326(a) conviction, although we reversed and remanded on a different ground. 411 F.3d. at 1088, 1092. In that case, a Border Patrol agent who was "performing line watch duties" received a radio alert from another agent who was operating a "night scope." *Id.* at 1086. The scope operator told the watch agent that he had "observed a group of people heading north in the area," near a pond located "about one mile north of the border," and guided the watch agent "to a location approximately one mile north of the border," where the defendant "was hiding in some brush." *Id.* at 1086, 1088. The watch agent testified at trial, but the scope operator who had first observed the defendant did not. *Id.* at 1086. The watch agent testified that he had "no idea" when the scope operator had first seen the defendant. *Id.*

We rejected the defendant's argument that no rational jury could have found the defendant free from official restraint from the time he crossed the border until he was apprehended. We noted that when the scope operator alerted the watch agent about the defendant's group, the group was "trekking north right around [an] area" that was "about one mile north of the border," and that the group was apprehended approximately one mile north of the border. *Bello-Bahena*, 411 F.3d at 1086, 1088. We determined that a reasonable jury could have concluded based on this testimony that the scope operator "first detected [the defendant] at some point after he crossed the border." *Id.* at 1088.

In both *Castellanos-Garcia* and *Bello-Bahena*, it was *possible* that the defendant might have been under constant observation. But in each case, there were facts sufficient to support a logical conclusion that the defendant was free from official restraint at some point after crossing the border. In each case, a crucial fact supporting an inference of freedom was that the defendant was known to have been first physically encountered some distance from the border—100 yards and one mile, respectively. *Castellanos-Garcia*, 270 F.3d at 774; *Bello-Bahena*, 411 F.3d at 1086; *see also, e.g.*, *Cruz-Escoto*, 476 F.3d at 1084 (finding sufficient evidence of freedom from restraint where agent first "saw [defendant] running northbound . . . approximately 100–150 yards inside the United States"); *Vela-Robles*, 397 F.3d at 787 (same, where defendant was first "encountered . . . about three-quarters to one mile north of the border"). Evidence that the defendant was first seen by one Border Patrol agent a distance from the border—along with the absence of any evidence that he was seen closer to the border by any other Border Patrol official—provides a logical basis from which

a jury can reasonably conclude that the defendant was free from observation or restraint for at least some brief period after crossing the border.

Ultimately, in determining whether the government has met its burden of establishing lack of official restraint beyond a reasonable doubt, the question is whether the evidence presented at trial supports beyond a reasonable doubt not just speculation, but the logical conclusion, that the defendant was at least briefly unobserved and unrestrained while within U.S. territory.

## C.

With these principles in mind, we evaluate the evidence the government presented in support of Liberato's prosecution.

To recap: Agent Hall testified that the first law enforcement observation of Liberato and his group was through a powerful infrared surveillance camera that had a range of at least one mile. But the camera operator did not testify, so there was no evidence presented regarding specifically when or where this camera first detected Liberato and his group, and no indication whether the group was seen on camera while on the Mexican side of the border, the American side, or while actually crossing the border. Agent Hall testified that the camera monitor would have been able to determine the "precise" "GPS location" of the "persons. . . observ[ed] near the border." But there was no testimony as to this precise location or the distance, if any, between this location and the place where Agents Lastra and Mondragon ultimately arrested Liberato.

Agent Mondragon testified that the nearest camera was on a hilltop to the east of the arrest location. There was no

testimony indicating whether this was the same camera Agent Hall said had first spotted Liberato and his group or a different one. Agent Mondragon also testified that he did not "believe" the hilltop camera would have been able to see the arrest location due to the distance from the camera and the obstructions from terrain and flora, and that Liberato's group was "not in view of any camera" at the arrest location.

Agent Mondragon also testified that it was Agent Lastra who first "ran into" or "encountered" Liberato's group. Agent Mondragon did not say that Agent Lastra told him any details about this encounter, including when or where Agent Lastra first saw the group, or whether Agent Lastra had observed the group crossing the border or had come across them only once they were already on U.S. side of the fence.[2]

When Agent Mondragon arrived at the scene, Agent Lastra was already with the group. Agent Mondragon did not remember the group ever being anywhere except right at the border fence.

\*      \*      \*

Viewing this evidence in the government's favor, no rational juror could have concluded beyond a reasonable doubt that Liberato was at any point free from official observation or restraint between the moment he physically crossed into U.S. territory and the moment he was apprehended.

---

[2] Agent Mondragon's testimony that Agent Lastra "notified [him] on his way out that he had encountered another group" was hearsay to the extent it was offered to prove that Agent Lastra actually encountered another group (as opposed to that he told Agent Mondragon he had, in explanation for his delay). But Liberato's counsel did not object to use of the testimony for its truth or ask for a limiting instruction.

To start, unlike in *Castellanos-Garcia* and *Bello-Bahena*, where each defendant was first encountered some distance from the border, there was no evidence that Liberato's group was ever anywhere other than immediately next to the border fence. In *Castellanos-Garcia* and *Bello-Bahena*, the distance from the border supported a reasonable inference, absent any evidence of prior observation, that the defendant had traveled freely and unrestrained to the point of first encounter. But here, Liberato's only established location—right next to the fence, in Agent Lastra's presence—does not support an inference that he was ever at large in U.S. territory.

In addition, in both *Castellanos-Garcia* and *Bello-Bahena*, there was testimony from the first agent to physically encounter the defendant. In *Castellanos-Garcia*, there was "not a scintilla of evidence" to suggest that any other agent or sensor had observed the defendant before the testifying agent did. 270 F.3d at 776. In *Bello-Bahena*, another agent had observed the defendant before the testifying agent's encounter: the night scope operator, who did not testify. 411 F.3d at 1086–87. Still, in *Bello-Bahena*, the defendant was "trekking north" in an area about a mile from the border when the scope operator radioed the testifying agent, who then apprehended the defendant a similar distance from the border. *Id.* at 1086, 1088. We concluded that in these circumstances, a reasonable jury could have inferred that the scope operator had first detected the defendant only after he was already within U.S. territory. *Id.* at 1088.

Here, by contrast, there was no testimony from the first agent to encounter Liberato directly—Agent Lastra. And, to the extent the jury accepted Agent Hall's testimony that Liberato was first observed through a camera, there was also

no testimony from the agent who observed Liberato via that camera, and no indication whether Liberato was in the United States or Mexico when so observed. As a result, there was no testimony whatsoever about where Liberato was or what he was doing when he was first observed in the United States.

Agent Mondragon was the only testifying agent who was present at the scene of the arrest. But he was not sure where Liberato was first encountered in the United States or where or how Liberato's group had entered. Instead, his testimony was couched in multiple layers of speculation. Agent Mondragon first testified that it was "hard to tell how they came in"—in other words, he did not know. He then said that groups like Liberato's "typically" entered by "cut[ting] a section of the fence" or "break[ing] open a door." He could not say whether he had inspected the fence near the arrest location or whether he had found signs of entry; he could only guess that he had "probably" looked for signs of breach and, if he did, that he "probably" had did not find any. And he also said that breaches are sometimes concealed after use, so he might not have seen evidence of a breach even if there had been one. Not finding evidence of breach therefore could not establish that there was none next to where Liberato was known to have been. Agent Mondragon also did not rule out that Liberato's group might have entered by scaling the fence rather than coming through it.

Agent Mondragon's speculative and irresolute testimony as to what could have happened—after he acknowledged he did not know what happened—does not logically support any conclusive inferences as to where or how Liberato and his group entered the United States. And without these crucial details, there was simply no evidentiary basis from which a jury could logically conclude, beyond a reasonable

doubt, that Liberato was ever anywhere in the United States other than where Agent Mondragon saw him—by the border fence, in the presence of Agent Lastra.

It is *possible*, to be sure, that there was a gap in observation. Given Mondragon's camera testimony, a reasonable juror could perhaps have found that there were no cameras observing the location where Liberato was arrested. And perhaps Liberato and his group traveled some distance unseen before reaching that location and being apprehended by Agent Lastra. But there is no *evidence* that that happened, just, at best, "mere speculation." *Nevils*, 598 F.3d at 1167. The only *evidence* is that Agent Lastra "encountered" Liberato. Whether this encounter took place while Liberato was crossing the border or only afterwards was not specified. And Liberato was right next to the border fence in Agent Lastra's presence at the only time Agent Mondragon could say where he saw him.

This is not a case, then, where the "record . . . supports conflicting inferences"—that Liberato either did or did not escape observation for some period. *Cf. Nevils*, 598 F.3d at 1164 (quoting *Jackson*, 443 U.S. at 326). An inference is a conclusion reached by "deducing a logical consequence" from a set of facts. *Inference*, Black's Law Dictionary (12th ed. 2024). Here, although the testimony presented does not entirely foreclose the *possibility* that Liberato briefly escaped observation, such a conclusion is not a logical consequence of the facts that are in the record—and certainly not a logical inference beyond a reasonable doubt. The speculative possibility that Liberato was at some point free from official restraint cannot serve as the basis for a criminal conviction.

In addition, although we conclude that the evidence presented was not sufficient to support a conviction regardless of the reasons why additional evidence was not presented, we note that in this case the gaps in the evidence presented were avoidable. This case is not one where the government had no option but to present the information it had and let the jury fill in the details. To the contrary, the shortcomings we have identified could have been easily cleared up if the government had presented testimony from Agent Lastra or, if it existed, evidence pertaining to the surveillance camera discussed by Agent Hall—evidence we have every reason to believe was within the government's grasp.[3]

The government was of course free to try this case how it saw fit. But the testimony from the witnesses the government did choose to call was full of gaps—gaps the government presumably could have filled with no inherent difficulty but, for its own undisclosed reasons, chose not to. That choice was the government's to make. But the consequence of that choice was that the evidence the government presented was not sufficient to meet its high burden of proof beyond a reasonable doubt.

In sum, based on the limited evidence presented, no rational jury could have "inferred beyond a reasonable doubt" that Liberato was at any point free from official restraint. *See Jackson*, 443 U.S. at 325.

---

[3] That Liberato could have also called Agent Lastra as a witness but did not is irrelevant to our analysis, as the burden of proof as to freedom from official restraint was on the government.

## IV.

We conclude that the evidence presented was insufficient to prove beyond a reasonable doubt that Liberato was at some point free from official restraint. We therefore **REVERSE** Liberato's conviction and **REMAND** for entry of a judgment of acquittal. *See United States v. Preston*, 751 F.3d 1008, 1028 (9th Cir. 2014) (en banc).

---

BENNETT, Circuit Judge, dissenting:

As the majority notes, the only issue is whether the government sufficiently proved that Wardy Alfonso Liberato was free from official restraint. *See United States v. Ruiz-Lopez*, 234 F.3d 445, 448 (9th Cir. 2000), *as amended* (Jan. 3, 2001) ("[To prove a violation under 8 U.S.C. § 1326(a)] the government must . . . establish that the alien entered the United States free from official restraint at the time officials discovered or apprehended him."). "Aliens who climb fences, raft canals, 'or otherwise sneak[ ] across the border in some illegitimate manner,' are under official restraint only if they are under constant governmental observation 'from the moment [they] set foot in this country until the moment of [their] arrest.'" *United States v. Cruz-Escoto*, 476 F.3d 1081, 1085 (9th Cir. 2007) (alterations in original) (citation omitted) (first quoting *United States v. Zavala-Mendez*, 411 F.3d 1116, 1120 (9th Cir. 2005); and then quoting *United States v. Castellanos-Garcia,* 270 F.3d 773, 775 (9th Cir. 2001)). Thus, the government may prove that a defendant was free from official restraint by showing that he "evade[d] the government's detection, *even for a brief time*." *United States v. Bello-Bahena*, 411 F.3d 1083, 1087 (9th Cir. 2005) (emphasis added).

Under *Jackson*'s sufficiency-of-the-evidence test,[1] the government proved beyond a reasonable doubt that Liberato evaded government detection for at least a brief period after illegally entering the United States.  Thus, I would affirm the district court's denial of the motion for acquittal.  The majority reaches a contrary conclusion because it fails to consider all the evidence and to draw all reasonable inferences in the government's favor.  The majority also improperly suggests that, in reviewing the sufficiency of the evidence, we should consider evidence that was *not* presented at trial.

## I.

In reviewing whether the evidence was sufficient to support a conviction, we conduct a two-step inquiry under *Jackson*.  "First, [we] must consider the evidence presented at trial in the light most favorable to the prosecution." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc) (citing *Jackson*, 443 U.S. at 319).  "[A]ll reasonable inferences are to be drawn in favor of the government, and any conflicts in the evidence are to be resolved in favor of the jury's verdict."  *United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1201–02 (9th Cir. 2000).  "Second, after viewing the evidence in the light most favorable to the prosecution, [we] must determine whether th[e] evidence, so viewed, is adequate to allow '*any* rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'"  *Nevils*, 598 F.3d at 1164 (last alteration in original) (quoting *Jackson*, 443 U.S. at 319).

---

[1] *Jackson v. Virginia*, 443 U.S. 307 (1979).

## II.

As relevant here, the government presented the following evidence. Agent Hall confirmed that "the first observation by law enforcement of [Liberato's] group of undocumented aliens was through a surveillance tower camera." Agent Mondragon then testified that Agent Lastra, while on his way to assist Agent Mondragon with a different group, "ran into" or "encountered" Liberato's group. The encounter occurred near a road just inside a "big" U.S.-Mexico border fence "that goes all through that area." The jury saw a picture of Liberato's group standing in the area where Agent Lastra encountered the group.



Agent Mondragon went to the location where Agent Lastra encountered Liberato's group, and Agent Mondragon helped Agent Lastra "process[]" that group. Agent

Mondragon testified that no surveillance camera could observe that location: "I don't believe you'll be able to see where [Liberato's] arrest took place because of the valleys, because . . . there are cactus, there are trees, there's brush in the way of the border road from the hillside. So I don't believe you'll be able to see the area where this arrest took place." In response to a jury question seeking to clarify "whether or not the group of people [Liberato] was a part of was in view of a security camera," Agent Mondragon confirmed that "they were not in view of any camera."[2]

The jury also submitted a question asking Agent Mondragon how Liberato's group crossed into the United States: "If you know, did these people scale the wall to get into America or was there an opening in the wall such as a gate since there was no port of entry?" Agent Mondragon responded:

> It's hard to tell how they came in but typically in that area they will either cut a section of the fence, which is called a bollard, they will cut the bollard, push it through, and they'll come in across that way or they will break open a door; there are gates or doors on the fence. They can either open a door, push the door open and come in that way, or cut a section of the fence, push it open, everybody will come in, they'll close it up, and sometimes they'll try to hide it from us so we

---

[2] The district court allowed the jury to submit written questions to witnesses.

cannot locate it and keep it going or it will be
out in the open.

Defense counsel then asked Agent Mondragon, "As part
of your investigation in this case, did you look along the wall
there for places where people could have entered or had
entered or had access to?" Agent Mondragon answered, "I
probably did and if I didn't report it, it's probably because I
didn't find where the breach was."

## III.

### A.

Viewing the above evidence "in the light most favorable
to the prosecution," *Nevils*, 598 F.3d at 1164 (citing *Jackson*,
443 U.S. at 319), a juror could reasonably conclude that
Liberato evaded government detection for at least a brief
period after illegally entering the United States.

Liberato was initially in view of a government
surveillance camera. There was no evidence establishing
where this camera observed Liberato. But the next time that
Liberato was spotted was by Agent Lastra, who was driving
on the road just inside the U.S.-Mexico border fence. This
area is not visible by any government surveillance camera.
Viewed in the government's favor, this evidence shows that,
after the camera first observed Liberato, he traveled some
distance out of the camera's view and ended up in the United
States, where he was found by Agent Lastra.

Agent Mondragon, who assisted Agent Lastra with
processing Liberato's group, did not know how the group
crossed into the United States. Agent Mondragon looked for
a breach in the fence where Liberato and his group could
have entered, but he did not find any breach. Drawing all

reasonable inferences in the government's favor, a juror could reasonably infer that, because Agent Mondragon looked for a breach and did not find one, Agent Lastra did not see Liberato and his group breaching the fence. Because no government surveillance camera could observe the area where Agent Lastra found Liberato and Agent Lastra did not observe Liberato breaching the fence, a juror could reasonably find that Liberato was not under constant government surveillance from the time he breached the fence until the time he was found by Agent Lastra. Based on that finding, a reasonable juror could conclude that the government had proved beyond a reasonable doubt that Liberato evaded government detection for a "brief time," *Bello-Bahena*, 411 F.3d at 1087, and thus was free from official restraint, *see Cruz-Escoto*, 476 F.3d at 1087 ("[I]f an alien sneaks across the border undetected, he is generally deemed to be free from official restraint regardless of the distance he travels in the United States.").

**B.**

The majority errs because it fails to consider all the evidence in the government's favor. The majority concludes that Agent Mondragon "did not say whether he" looked for a breach in the fence or "only guess[ed]" that he did because he testified only that he "probably did." Maj. at 7, 18. But such a characterization fails to construe Agent Mondragon's testimony "in the light most favorable to the prosecution." *Nevils*, 598 F.3d at 1164 (citing *Jackson*, 443 U.S. at 319). Properly viewing the testimony, we must assume that Agent Mondragon did in fact look for a breach but found none. As discussed above, a juror could reasonably infer from that premise that Agent Lastra did not observe Liberato and his group breaching the fence. That is a logical inference. If Agent Lastra had seen where and how Liberato and his group

had breached the fence, there would have been no need for Agent Mondragon to look for a breach. The majority's failure to acknowledge the reasonable inference that Agent Lastra did not observe Liberato breaching the fence stems from its failure to consider Agent Mondragon's testimony in the light most favorable to the government.

The majority's decision also improperly suggests that we should consider evidence that was *not* presented at trial. *See, e.g.*, Maj. at 7 ("Because Agent Lastra did not testify, . . . there was no testimony concerning where and how Agent Lastra first came across Liberato and his group."); Maj. at 17 ("Here, by contrast, there was no testimony from the first agent to encounter Liberato directly—Agent Lastra."). Any suggestion that we should consider evidence that was not presented is plainly incorrect. The majority rewrites the longstanding test of how we review sufficiency-of-the-evidence challenges. *Jackson* requires us to look at the evidence that was actually presented at trial. *See Nevils*, 598 F.3d at 1164 ("[We] must consider *the evidence presented at trial* in the light most favorable to the prosecution." (emphasis added) (citing *Jackson*, 443 U.S. at 319)).

But there is another fundamental problem with the majority's decision—in addition to ignoring clear precedent on how we review the sufficiency of the evidence, the majority also improperly suggests to the government as to how it should have tried this case:

> This case is not one where the government had no option but to present the information it had and let the jury fill in the details. To the contrary, the shortcomings we have identified could have been easily cleared up if the government had presented testimony

from Agent Lastra or, if it existed, evidence
pertaining to the surveillance camera
discussed by Agent Hall—evidence we have
every reason to believe was within the
government's grasp.

Maj. at 20.[3]  In so doing, the majority intrudes on the
function of a co-equal branch of government and wrongly
interposes "a 'chancellor's foot' veto over law enforcement
practices of which it [does] not approve." *United States v.
Russell*, 411 U.S. 423, 435 (1973); *accord United States v.
Hullaby*, 736 F.3d 1260, 1263 (9th Cir. 2013) ("[T]he due
process clause does not give the federal judiciary a
chancellor's foot veto over law enforcement practices of
which it [does] not approve." (second alteration in original)
(quoting *United States v. Simpson*, 813 F.2d 1462, 1468 (9th
Cir. 1987))).

\*      \*      \*

The majority improperly orders the acquittal of a person
the jury properly found guilty beyond a reasonable doubt.
Thus, I respectfully dissent.

---

[3] Of course, there is no requirement that the government present
testimony from the agent who first observed the defendant. *See Bello-
Bahena*, 411 F.3d at 1088 (holding that the government proved the
defendant was free from official restraint even though the first agent to
detect the defendant did not testify).